MARY E. JESSE ET AL., APPELLEES, V. LAFE BROWN ET AL., APPELLANTS.

FILED JANUARY 23, 1909.   No. 15,415.

Cancelation of Instruments: EVIDENCE. Evidence examined and discussed in the opinion, *held* sufficient to sustain the judgment of the district court.

APPEAL from the district court for Jefferson county: WILLIAM H. KELLIGAR, JUDGE. *Affirmed.*

*Heasty & Barnes,* for appellants.

*Talbot & Allen, T. W. Tipton* and *C. H. Denney,* contra.

*John C. Hartigan,* guardian *ad litem.*

GOOD, C.

John Brown died intestate on the 7th day of May, 1906. A few hours previous to his death he attempted by warranty deed to convey to his son Lafe Brown the northwest quarter of section 13, township 1, range 4 east of the sixth P. M., in Jefferson county, Nebraska. This action was brought by certain of the heirs of John Brown against all of the other heirs at law of John Brown, including Lafe Brown and his wife, Etta Brown. In their petition the plaintiffs alleged that on the 7th of May, 1906, John Brown was the owner of said premises; that he was a man 98 years of age, mentally weak on account of his age, very deaf, almost blind, seriously and dangerously sick; that he could never read, write, nor sign his name; that he died about 11:30 P. M. of said day; that, about five hours before the death of said John Brown, the defendant Lafe Brown intending to cheat and defraud the other heirs at law of said John Brown, fraudulently induced him to sign a warranty deed conveying said premises to said defendant; that no consideration was paid for said transfer; that by reason of said John Brown's physical and mental disabilities he was incompetent to transact any business, and that said deed was never delivered; that for more than three years prior thereto said John Brown had been living with the defendant Lafe Brown and family on said premises, and that by reason thereof, and the relationship of father and son, and the infirmities of said John Brown, the defendant Lafe Brown was able to and did, by undue influence, induce said John Brown to execute said deed, and thereby fraudulently procured title to said premises. They prayed for a cancelation of the deed, and that the title to the premises be quieted and confirmed in all of the heirs at law of John Brown, deceased.

The defendant Lafe Brown answered, and alleged that on or about the 2d day of March, 1903, the said John

Brown and said defendant entered into an oral agreement, by the terms of which said defendant and his family were to move upon and take possession of said premises, care for said John Brown, furnish him a home with said defendant, with the necessary food and such care and attention as he should need in sickness and in health during the remainder of his natural life, and in consideration thereof and of natural love and affection said John Brown was to convey said premises by good and sufficient deed to said defendant; that pursuant to said agreement said defendant and his family moved upon and took possession of said premises, and fully complied with the terms of said agreement until the death of said John Brown; and that pursuant to said agreement the said John Brown, while in possession of all of his faculties, executed and delivered said deed to said defendant, and thereby conveyed said premises to him.   Said defendant prayed, among other things, that if the court should find that there was no delivery of said deed, or that the said John Brown at the time of the execution thereof was incompetent to execute the same, the court should decree specific performance of said oral agreement, and that his title to said premises be quieted and confirmed.   All of the defendants other than Lafe Brown and his wife joined with the plaintiffs in asking the same relief as prayed for in the petition.  All of the affirmative allegations of the answer were denied in the reply.

A trial was had upon the issues so joined.  The court found that the deed was made without consideration, was procured by undue influence exercised by the defendant Lafe Brown, and was executed when said John Brown was incompetent, and that there was no delivery of the deed.  It further found that no contract was entered into between said defendant and John Brown whereby the latter agreed to convey the lands to said Lafe Brown.  The court entered a judgment in conformity with its findings. From that judgment the defendants Lafe Brown and Etta Brown have appealed.

The only assignments of error relied upon by appellants are that the judgment is contrary to the weight of evidence and is not sustained by sufficient evidence.

We will first consider the evidence relating to the competency of John Brown to make the deed on May 7, 1906. The record shows that Mr. Brown was 98 years old; that he could neither read nor write; that he was hard of hearing, and his eyesight greatly impaired. In addition to the land in controversy, he owned 480 acres of other land, which he rented, and that he personally superintended the marketing of his grain and the collection of his rents; that he had been vigorous mentally and physically until the later years of his life, when he became somewhat feeble, eccentric, filthy and careless in his personal habits; that he would go to bed with his clothes and muddy boots or shoes on, and on a number of occasions had shown a disregard of the proprieties in exposure of his person; that he kept a tub of water standing in his room without any known reason therefor, and on one occasion he lost his way with his horse and buggy upon the highway and wandered into a field, and did other things tending to show a mental decline. A number of witnesses testified that they did not think him competent to transact business during the last two years of his life. For three years before Mr. Brown's death Lafe had rented and cultivated the farm in controversy, and he and his family had occupied the residence except the one room occupied by the father. Lafe and his family furnished the old gentleman with his meals, and took care of his room and did his washing. For two weeks previous to his death he was too feeble or ill to go to the table for his meals. On the 6th of May he was suffering from a cold and pain in his side, and a physician was consulted and prescribed for him. On the morning of the 7th the physician was called and examined him, and testified that he found Mr. Brown with a temperature of 101, his pulse 110 to 120, and his respiration 28 to 30; that his right lung was filled with mucus or phlegm, and his left lung somewhat involved,

and that he was suffering from lobar pneumonia with pleurisy complications. It is evident that the doctor considered Mr. Brown dangerously sick, and so informed Lafe and his wife, for they immediately thereafter sent telegrams to various members of the family in different states informing them of Mr. Brown's sickness and asking them to come. On the afternoon of May 7 Lafe telephoned to Mr. Price, a banker and notary public at Diller, to come out and draw some papers for his father. According to the evidence of Etta Brown, Lafe's father had requested that Mr. Price be sent for. There is some difference in the testimony as to the time Mr. Price arrived at the Brown residence. Upon a consideration of all the evidence and the circumstances, it appears reasonably certain that Mr. Price reached the Brown residence a little after 6 o'clock in the afternoon. Mr. Price testified that he was informed by Lafe that his father wished him to draw a deed conveying the 160 acres upon which they lived to Lafe Brown; that he went to Mr. Brown's bed and roused him, and asked him how he was feeling, to which Mr. Brown responded: "Oh, I want to rest"; that he inquired of him if he wished him to draw a deed to his son for the 160 acres of land on which he lived, and Mr. Brown said, "What"? that he repeated his question, and Mr. Brown answered "Yes"; that the deed was drawn, and he took it to Mr. Brown informing him what it was and asking him if he wished to sign it. Mr. Brown again responded "Yes." Mr. Brown was propped up in bed, and placed his hand upon the pen, which was guided by Mr. Price in making his mark. Mr. Price then asked Mr. Brown if it was his voluntary act and deed, and he again said "Yes." Without any direction from Mr. Brown, Mr. Price handed the deed to Lafe, informing him it would be necessary for him to bring the deed in to town to have the notarial seal placed upon it. Lafe handed the deed back to Mr. Price, directing him to put his seal upon it and send it to Fairbury for registration. Mr. Price was at the Brown residence for half an hour or more, and the

foregoing is all that is shown to have been said by Mr.
Brown during Mr. Price's visit. Mr. Price saw nothing
to lead him to believe that Mr: Brown did not understand
or comprehend what he was doing. At 7 o'clock Mr.
Brown became unconsious, and so remained until his
death at 11 : 30 that night. It is apparent that he became
unconscious within a few minutes after the signing of the
deed, and died five hours later. Mrs. Etta Brown testi-
fied that after Price had gone Mr. Brown asked Lafe if
he was satisfied with what he had done. From other wit-
nesses it appears that Mr. Brown was in more or less of
a stupor during the afternoon previous to his death.
Upon hypothetical questions fairly reflecting Mr. Brown's
condition and illness, four physicians testified that in
their opinion he was wholly incompetent to transact any
business at the time of the signing of the deed. They
testified that the filling up of the lungs with mucus and
phlegm prevented access of sufficient air to the lungs to
properly oxidize the blood, and that the necessary result
thereof was that the patient became dull, stupid, and re-
lapsed into a comatose condition, from which he might
be roused and might temporarily know what was said to
him, but that he would be without power to reason or
think connectedly or to understand any business transac-
tion.

From the consideration of this testimony and from other
circumstances needless to mention, we think the evidence
warranted the finding that Mr. Brown, by reason of his
advanced age, feeble condition, and serious illness, was
incompetent to comprehend or understand what he was
doing at the time he signed the deed. In this connection
it is proper to say that the only evidence tending to show
that Mr. Brown was competent at the time of signing the
deed was that of Mrs. Brown, Mr. Price and Dr. Pritch-
ard. Mrs. Brown was an interested witness, and in addi-
tion thereto her testimony is in direct conflict with that
of a number of disinterested witnesses on several ma-
terial points. With reference to Mr. Price, it will be ob-

served that his opinion was based upon a visit of a half an hour, and that during that time Mr. Brown spoke less than 20 words, and spoke no word except when he was roused and in response to a question, and that one of the questions had to be repeated to him before he apparently understood it.  We are of the opinion that the evidence of the physicians as to Mr. Brown's mental condition was entitled to greater weight than the opinions of Mr. Price and Mrs. Brown.  The findings of the district court that Mr. Brown was incompetent to make the deed was entirely justified by the testimony.

The only evidence of the existence of an agreement between Mr. Brown and his son Lafe for the conveyance of the land is that of Mrs. Etta Brown.  She testifies that in September, 1902, she heard a number of conversations between Mr. Brown and her husband to the effect that, if Lafe would move onto the farm and take care of his father during the rest of his life, his father would convey to him the quarter section of land.  As before noted, the testimony of Mrs. Brown was in direct conflict with that of a number of other witnesses, some of whom were disinterested.   In June, 1903, Mrs. Brown wrote a letter wherein she stated that her husband was bound to go to Oklahoma the coming fall, and if he liked it to buy a farm there.   On one occasion after the making of the alleged contract, Mrs. Brown is shown to have requested Mr. Brown to convey the land to her husband, and that he refused, and said they should get their start as he got his. On one occasion Lafe is shown to have unsuccessfully tried to induce his father to make a will leaving him the farm. At a meeting with his brothers and sisters in Illinois immediately after his father's funeral he told his sisters and brothers that his father had not recompensed him for his care of him, that his father had done nothing for him. On the night of his father's death he told two of his neighbors that his father had but a short time previously made a will leaving him 160 acres of land, and $4,000 out of his other property, and that his father had thought that was

too much, and had changed it and had left him 160 acres by will. Lafe, some weeks after his father's death, when questioned as to the deed, said: "Father had always said he would give me a farm." On one occasion after the making of the alleged contract, when his father found fault with him for the way in which he managed the farm, Lafe said: "If you are not satisfied with the way I am farming your place, just get Walter Ross back here." Another significant fact is that no one outside of the interested parties ever heard of the making of the alleged oral agreement until long after the death of Mr. Brown. From a consideration of this evidence, we do not think it can be said that the contract has been proved by clear and satisfactory evidence. The burden of proof was upon the defendant Lafe Brown to establish the contract by clear and satisfactory evidence. *Harrison v. Harrison*, 80 Neb. 103; *Peterson v. Estate of Bauer*, 76 Neb. 652, 661, and cases there cited. In view of all of these circumstances, we think the contract is not clearly and satisfactorily proved.

The judgment of the district court is right, and should be affirmed.

DUFFIE, EPPERSON and CALKINS, CC., concur.

By the Court: For the reasons given in the foregoing opinion, the judgment of the district court is

AFFIRMED.