PETER E. MILLER ET AL., APPELLANTS, v. W. C. WENTZ COMPANY ET AL., APPELLANTS; EMIL J. KREMER, APPELLEE.

FILED FEBRUARY 5, 1916. No. 18582.

1. **Deeds:** SETTING ASIDE. Courts hesitate to set aside deeds merely because of the mental weakness of the grantor, where a total want of reason is not shown. But where mental weakness exists, and misrepresentation on the part of the grantee, or those in privity with him, is shown, a court of equity will, in a proper case, grant relief.

2. **Vendor and Purchaser:** BONA FIDE PURCHASERS: EVIDENCE. Evidence set out in the opinion *held* sufficient to show that defendants Barnes and Wentz were not *bona fide* purchasers for value.

APPEAL from the district court for Hamilton county: GEORGE F. CORCORAN, JUDGE. *Affirmed, with directions.*

*Hainer, Craft & Edgerton, W. A. Prince* and *W. G. Hastings,* for appellants.

. *J. H. Grosvenor, contra.*

MORRISSEY, C. J.

This is a suit in equity to set.aside deeds of conveyance covering a farm of 160 acres, a five-acre tract in the sub-·urbs of the city of Aurora, and a house and lot located in that city, all of the property being in Hamilton county, Nebraska. The suit was brought by Peter E. Miller through his guardian and next friend, and by Mrs. Miller for herself. Anna Poole intervened, but her interests are not herein involved and no further reference will be made to her. On and prior to May 29, 1913, Peter E. Miller was the owner of this real estate. The family lived in the city, at least a part of the time, but operated the farm and the five-acre tract. The defendants Wentz were engaged in the real estate business in Aurora; the defendants Adams were of the same occupation, with their principal place of business in Colorado; defendant Barnes lived in Aurora and appears to have been a subagent for Adams, while the defendant Kremer was a farmer living in Hamilton county.

Through the solicitation of defendants Adams and their agent, Barnes, Miller was induced to go to Colorado to look over land with the view of trading some of his Hamilton county property therefor. No trade, however, was made following his first visit to Colorado; but a few days later Miller, in company with his 16 year old boy and the defendant Barnes, again went to Colorado, and this time he inspected a section of land, which was represented as the property of E. E. Adams. While in Colorado a contract was drawn up whereby Miller agreed to transfer the Hamilton county real estate for this section of Colorado land, and give a mortgage back on the Colorado land for something in excess of $3,000. Miller and Barnes then returned to Aurora, and Mrs. Miller affixed her signature to the contract. For the purposes of the trade it was agreed that Miller's farm should be put in at the gross price of $20,000,

and that there should be deducted therefrom the amount
of the mortgage then resting as a lien thereon in the sum
of $6,000.    The agreed price of the five-acre tract was
$2,350, which was represented to be clear of incumbrance,
and the city property was put in at an agreed price of
$4,500, subject to a mortgage of $1,500, which was to be
deducted from the gross amount.   Adams' Colorado prop-
erty was put in at $35 an acre, or a gross amount of
$22,400, and was to be free and clear of incumbrance.    It
was agreed that the difference, $3,050, should be covered
·by Miller executing and delivering to Adams a note se-
cured by mortgage on the Colorado property for the
amount.    It was agreed that Miller should retain posses-
sion of the farm until March 1, 1914, but pay as rent there-
for one-fourth of the crops raised; that possession of the
other property should be surrendered upon the execution
and delivery of the deeds.    This contract bears date May
17, 1913, and on May 29 following Miller and wife executed
deeds conveying all of their property heretofore described,
and accepted a deed to the Colorado property, and executed
a note for $3,200 secured by mortgage on the Colorado
property.   Adams was not the owner of this land, as stated
in the contract he made with Miller, but it was owned by
one Cummings, who executed a deed therefor and sent it
to a bank in Aurora, with the name of the grantee blank,
and with instructions that it be delivered upon payment
of $8,400.

Adams had come to Aurora and arranged with defend-
ants Wentz to pay this money to the bank for the Cum-
mings deed and to take over the Miller farm at the agreed
price of $14,400.   The farm being subject to a $6,000 mort-
gage, it was necessary for Wentz to advance only the
amount required to take up the Cummings deed.   This he
did, and Miller executed a deed conveying the farm to
Wentz.   By an arrangement between Adams and Barnes,
the five-acre tract was deeded by Miller to Barnes.   It is
said that the consideration was $1,700 or $1,800, about
one-third of which was paid in commissions due from Ad-

ams to Barnes; a part being a commission on this Nebraska trade. Kremer was in no way connected with the trades, but was in the market for a residence property, and was shown this property by Wentz and induced to buy at an agreed price of $3,500, and the Millers delivered him a deed to that property. These deeds were all made and delivered on May 29, 1913. In July following this suit was instituted.

The petition alleges that the contract and deeds were obtained by fraud, misrepresentation and undue influence practiced upon Peter E. Miller, who was mentally incompetent. The defendants Wentz deny the allegations of fraud and undue influence and the incompetency of Miller, and as an affirmative defense claim to be *bona fide* purchasers for value; that plaintiffs, having executed the deed and accepted a lease from them to the farm, are estopped from assailing their title. Barnes denied generally the allegations of fraud, undue influence and mental incompetency of Miller, and claimed to be a *bona fide* purchaser for value without notice or claim of fraud. Kremer also claimed to be a *bona fide* purchaser, and that he purchased the property through his codefendants Wentz and paid therefor its full value. The court entered a decree setting aside the deeds to the farm and the five-acre tract, but sustaining the deed covering the city property. Defendants Wentz have appealed from so much of the decree as affects the farm; Barnes has appealed from the decree as affecting the five-acre tract; and plaintiffs have appealed from so much of the decree as covers the city property.

The first thing to determine is the mental capacity of Miller. There is little conflict in the testimony as to his condition up to the time these trades were made; but, of course, different minds may draw different conclusions. He had lived in Hamilton county about four years prior to this trade, and many of his neighbors were called as witnesses. It would serve no useful purpose to quote their

testimony. It is conceded by every witness that he was not
of normal mentality. Yet with the advice and assistance
of his wife he had transacted a large amount of business
and appears to have been reasonably successful. He in-
herited property in Illinois. He sold that at a good figure
and brought the proceeds to Nebraska and made an ad-
vantageous ·investment. · It was agreed between all par-
ties that the question of his mental condition should be
submitted to a board of nine experts. This board made the
following report:

"Alienists' Report.
"Aurora, Neb., Oct. 21, 1913.

"We, the undersigned, physicians summoned to testify
in the case of *Miller et al. v. Wentz et al.,* do hereby certify
that after a careful,. thorough and painstaking examina-
tion, we are of the opinion that the plaintiff, Peter E.
Miller, is a feeble-minded individual, or in other words an
imbecile of not the highest grade. We find that Peter E.
Miller is mentally and physically deficient; that we would
denominate him feeble-minded. We believe that he is not
insane, meaning by this that there has been no perversion
in his mental functions from his normal, which has always
been deficient. We believe that he is able to carry on the
ordinary, simple duties of life. The question of his ability
to accomplish the greater matters of business must neces-
sarily depend upon the influences which are brought to
bear and the impress which they have upon one who is
not as strong mentally as the average human individual.

"Joseph M. Aikin, M. D.<br>
"F. E. Coulter, M. D.<br>
"W. B. Kern, M. D.<br>
"Benj. F. Bailey, M. D.<br>
"L. B. Pilsbury, M. D.<br>
"E. A. Steenberg, M. D.<br>
"D. S. Woodard, M. D.

"We, the undersigned, dissent from the word 'im-
becile,' but concur in the statement that he is physically

and mentally defective, and indorse the remainder of the majority report.

"W. D. Guttery, M. D.
"M. W. Baxter, M. D."

Giving proper credit to this report, which is in harmony with the testimony of the lay witnesses, we must determine whether he was able to meet on fair terms the experienced real estate men with whom he had to cope. To determine this question, we are not compelled to rely alone on the testimony offered as to his mental capacity. We may consider the facts admitted, or established beyond all controversy, and their relation to and bearing upon the question under consideration. In fixing the price of the property, the Colorado land was priced at $35 an acre. This is conceded to be more than it was worth. Plaintiff's property was also priced at a value in excess of its true worth, and this practice is not uncommon in the exchange of property. But as deeds to these properties were all exchanged on May 29, we may consider the prices realized as determining their values. Mr. Cummings, the owner of the Colorado land, realized but $8,400, $3,200 of which under the arrangement with Adams was paid by the note and mortgage executed by Miller. The equity in Miller's farm sold to defendants Wentz for $8,400. The city property sold to Kremer for $3,500, and the acre property to defendant Barnes for $1,700. Even on these figures Miller lost by the transaction $5,200. It is contended, and we think fairly shown by the evidence, that Miller's property was actually worth more than the prices paid by Wentz, Barnes and Kremer. This transaction for a man in his station in life may be termed one of these "greater matters of business" mentioned by the alienists.

In view of the circumstances, we are convinced that Miller was not capable of comprehending fully the nature and effect of the transaction, and was unfitted to attend to business of such importance as the trade of his entire real estate holdings for property he had seen but once, and then only under the watchful eye of the trained broker.

Courts hesitate to set aside deeds merely because of the weakness of mind of the grantor, where a total want of reason is not shown. But where mental weakness exists and misrepresentation is shown, a court of equity will grant relief and set aside a deed which has been secured through the fraud and undue influence of the grantee. "The acts and contracts of persons who are of weak understandings, and who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning, or artifice, or undue influence." 1 Story, Equity Jurisprudence (13th ed.) sec. 238. *Allore v. Jewell,* 94 U. S. 506.

Defendant Barnes had full knowledge of the entire transaction and was credited with a commission for bringing about the trade. He took title with full knowledge of the misrepresentation that had been made to Miller, and is in no sense to be considered an innocent purchaser for value. The defendants Wentz, it is true, are not shown to have knowledge of the value of the Colorado property, but they did have knowledge of the contract made between Miller and Adams. This contract showed that the land was represented as being the property of Adams, and was being put in on the trade at $35 an acre. They also knew that the property did not belong to Adams, but to Cummings, and that Cummings was receiving only $13 an acre. As experienced real estate dealers they must have known that its value was not far in excess of the amount for which its owner had it listed upon the market. With knowledge of these facts they advanced the money to buy the Cummings land, and, as a part of the same arrangement and agreement between themselves and Adams, they took this deed, Miller's name was filled in as grantee, and Miller was induced to deed his farm to Wentz. Defendants Wentz stepped into Adams' shoes and assisted in carrying to completion the contract secured by the misrepresentation and fraud of Adams, and they cannot be held to be

innocent purchasers for value. Inasmuch as the defend-· ants Barnes and Wentz voluntarily took Adams' place in carrying out the terms of the written contract, they took their deeds subject to all the infirmities that would have come with them had the deeds been made to Adams. *Thomas v. Sweet,* 111 Ky. 467.

. The point is made by counsel for Wentz that plaintiff accepted a lease from them and was in possession of the farm under this lease at the time suit was brought, and cites authority holding that the tenant while in possession may not question the landlord's title. But the facts in this case do not bring us within that well-established rule. When the contract was made for the exchange of the properties, it was provided therein that Miller should retain possession of the farm for the remainder of that year, paying as rental therefor one-fourth of the crop. In place of writing this provision in the deed of conveyance from Miller, it was put in a separate paper in the form of a lease, and this appears to have been done on the suggestion of Wentz, who desired and insisted that the original contract be surrendered. By changing the evidence of this agreement, they did not change the true status of the parties, and Miller is not estopped because he accepted this lease and surrendered the old contract.

Defendant Kremer had no notice that any fraud or imposition had been imposed upon Miller. He was in the market for a residence property. This property was offered for sale, and he bought without anything to arouse a suspicion of unfair dealing. He appears to have been a purchaser in good faith for a valuable consideration, and his title will not be disturbed. Plaintiffs offered to do equity by conveying the title to the Colorado property to whomsoever the court might order, but no order in relation thereto was made.

The judgment is affirmed, but the district court is directed to ascertain and determine the value of Miller's equity in the house and lot at the date of the transfer to Kremer, and if defendants Wentz pay the amount so found

as the value of the equity into court for the benefit of plaintiff within 30 days from the entry of the order, plaintiffs be directed to convey such equity as they hold in the Colorado land to them by quitclaim deed.

AFFIRMED, WITH DIRECTIONS.

LETTON, J., not sitting.