FRANCIS·CHASE ET AL., APPELLANTS, V. ALBERT J. LAVELLE ET AL., APPELLEES.

FILED MARCH 11, 1921. No. 21363.

1. **Adverse Possession:** PARTIES IN PARENTAL AND FILIAL RELATIONSHIP. As between parties sustaining parental and filial relations, the possession of the land of the one by the other is presumed to be permissive, and not adverse. To make such possession adverse, there must be some open assertion of hostile title other than mere possession, and knowledge thereof brought home to the owner of the land.

2. **Deeds:** CANCELATION: PARENT AND CHILD. Where it appears, in a suit to cancel a deed from a parent to a child, that mental weakness of the parent combined with artifice and misrepresentations of the child induced the execution of the deed, a court of equity will cancel it.

3. ———: DEED FROM PARENT TO CHILD: PRESUMPTIONS. When a deed is executed for a nominal consideration by an aged parent shortly

before her death, whereby all the grantor's estate is conveyed to one child to the exclusion of her other children without any apparent reason for so doing, the courts will scrutinize the transaction with care; the presumption is against the validity of the deed. *Winslow v. Winslow*, 89 Neb. 189, followed.

4. ————: CANCELATION: EVIDENCE. Evidence examined, and *held* to require a cancelation of the deed, and to quiet title in all the children of the deceased grantor.

APPEAL from the district court for Greeley county: BAYARD H. PAINE, JUDGE. *Affirmed in part, and reversed in part, with directions.*

*A. H. Murdock* and *Lanigan & Lanigan,* for appellants.

*James P. Boler* and *P. J. Barrett, contra.*

CAIN, C.

Plaintiffs, Francis, John, Charles and Ambrose Chase, are minor children of Mrs. Anna Chase, who died intestate on May 17, 1919, and bring this suit by their next friend to cancel a deed made October 17, 1918, by their mother to the defendant Albert J. Lavelle, of the southwest quarter of section 4, in township 18, range 10, west of the sixth principal meridian, in Greeley county, Nebraska, and to cancel a tax deed thereto issued to him by the county treasurer on July 6, 1907, and to quiet title in them and Albert J. Lavelle, also a son of deceased, as heirs at law of their deceased mother, and also for an accounting for rents. The grounds upon which cancelation of the first-named deed is sought are that the mother was mentally incompetent to make it, that it was procured by the fraudulent representations of the grantee, and that the consideration of $200 therefor was grossly inadequate. Cancelation of the tax deed is asked on the ground that it is void for lack of compliance with the statutory requirements authorizing the county treasurer to execute it. TheTravelers Insurance Company of Hartford, Connecticut, was made a party defendant because it holds a mortgage for $8,000 executed January 30, 1919, by the defendant Albert J. Lavelle and wife upon the quarter section

above described and also upon the northwest quarter of section 9, in township 18, immediately adjoining to the south; and plaintiffs ask, in the event that they prevail and the mortgage is foreclosed, that the last-described quarter section be sold first to satisfy the debt. The mortgagee did not answer. The answer of the principal defendant, Albert J. Lavelle, denied the grounds alleged for the cancelation of the deeds, pleaded that the deed of October 17, 1918, from his mother to him was valid, and further averred that he had adversely occupied the land for more than the statutory period, whereby he had acquired title thereto. The reply denied the averment of adverse user, and the amended petition alleged that such user was permissive. The court below found generally for the principal defendant, Albert J. Lavelle, and quieted title in him, and further found that the deed of October 17, 1918, was valid, and that he had practiced no fraud in obtaining it, and that he had adversely occupied the land for the statutory period, whereby he had acquired title, but found that the tax deed was void. Plaintiffs appeal, asking a reversal of the decree, except the finding therein that the tax deed is void. As it clearly appears that the tax deed is void, and as there is no contention that it is valid, it may be dismissed from further consideration, except as it appears in a narrative of the facts.

The material facts are substantially without dispute and are as follows: About 1880, Patrick Lavelle, Sr., with his family of several sons and daughters, including Anna, mother of plaintiffs, went to Greeley county and homesteaded. The father entered the northwest quarter and his daughter Anna the southwest quarter of section 4, as homesteads, the latter quarter being the land in controversy. Both received patents from the government. Anna's being issued June 5, 1890. The family residence, however, was maintained on the northwest quarter, which Patrick Lavelle, Sr., took as a homestead, which he owned until 1907, and on which he lived until 1903. No buildings were ever put on Anna's quarter, except a shanty she had on it

before she got her patent, and no one has ever lived upon it since that time. Except for a fence, which her father built around it in 1891, and the breaking of a few acres, and the placing of a hydraulic well and windmill by the defendant Albert J. Lavelle sometime after 1910, no improvements have ever been made on this land. It has always been used in connection with the northwest quarter, on which the family lived, and chiefly as a pasture and hay meadow. In 1881 the defendant Albert J. Lavelle was born on this homestead of Patrick Lavelle, Sr., where he lived with his grandfather until 1903. After Albert's birth, his mother, Anna Lavelle, went to Omaha, where she was employed until about 1898, but she made many visits to her father's home in Greeley county where her son Albert was living. During that period of about 17 years her father managed her land in conjunction with his own, and paid the taxes on it, and continued to do so up to 1903, when he left his farm. On January 1, 1898, three days before her marriage, Anna Lavelle signed and acknowledged a deed of her land to her son Albert for the expressed consideration of $1,000. Three days later she married Mr. Chase in Omaha, and they immediately went to San Francisco to live. On December 13, 1898, this deed was recorded, and in November, 1899, soon after the birth of her first child by Mr. Chase, Anna Lavelle Chase began action in the district court for Greeley county to have it set aside. We gather from her petition in that case that she claimed never to have delivered the deed, but to have placed it in her trunk in her father's house for safe-keeping. At any rate, her case went to decree on January 10, 1900, and the court found in her favor and canceled that deed and quieted title in her. The court also found that the deed was never delivered, but that the defendant Albert J. Lavelle obtained the same and caused it to be recorded without authority, and that he retained the same over her protest; that there was no consideration for the deed other than love and affection; and that she never intended delivery thereof until some indefinite future date and con-

tingency. Anna testified at the trial in Greeley in January, 1900, and a few months afterward left for California, where she lived until her death on May 17, 1919, and never returned to Nebraska. She was, therefore, absent from Greeley county for 19 years. She had, however, a little correspondence with Albert and her sister, Kate O'Connor, who lived in Greeley county.. None of her letters to Albert were offered in evidence.

In 1903 and 1904 Albert rented the Sweedler quarter and farmed it and lived with his aunt, Kate O'Connor, while he was tending the crops, and then returned to his grandfather's homestead, which his uncle, Martin Lavelle, was farming in connection with Anna's quarter, as before. In 1905 Albert was married and lived on his grandfather's homestead which he and his uncle Martin rented, up to March 1, 1907, during which period the homestead was operated in 'conjunction with his mother's land. He also worked a quarter section of his own immediately south of his mother's land. Albert bought his mother's land for the delinquent taxes of 1903, and on July 6, 1907, received a tax deed from the county treasurer, which, as before stated, was void. From the time he received this tax deed, Albert testifies that he claimed to own the land, and that he took possession of it, rented it, and collected the rents, and paid the taxes on it; that, in the summer of 1910, he broke up about 27 acres, and in 1915 about 20 acres more, and fixed the fences and put in a hydraulic well and windmill. There is no evidence that his mother knew anything about what Albert was doing, or that he ever told her of his occupancy of her land until his letter of September, 1918, hereinafter set out. There is also the testimony of several witnesses to corroborate Albert's dominion over the place from 1907 onward.

On September 13, 1918, Albert's attorney composed and typed the following letter, which Albert copied with pen and ink on other paper, and, adding a few words, mailed to his mother at San Rafael, California, as his own:

Chase v. Lavelle.

"Sept. 13th, 1918.

"Dear Mother: I have not heard from you in some time and thought that I would write you at this time as I have been thinking of moving onto the place and improving it.

"I have a tax deed to the place and it will be necessary for me to go through court to perfect my title, that is to give me a good record title. I have always claimed the farm and still claim it but your deed is on record and it will be a cloud on the title, to give me the proper record title so that I can secure a loan on the farm I must go through court and secure a deed in that manner.

"I have consulted an attorney and he said that the expense of the action would be in the neighborhood of $200 and I would rather you would get that than to pay it to some lawyer, now if you will send me a quitclaim deed to the farm that will clear the title and I can borrow money on the place and improve it. As far as the ownership of the place is, concerned I know that I am the owner of it but owning property and then trying to borrow on it there is always some flaw found in the title. I have had the exclusive open and adverse possession of the farm under my tax deed for more than ten years and that gives me a perfect title but I must go through court with it.

"Now mother that will save a lot of expense and will be lots easier for me to give you the money than to pay it to a lawyer and I hope that you will send the deed as soon as possible as I want to get to work on the place this fall, and if I do not receive the deed I must start the court action at once, send the deed to either banks at Greeley or place it in a bank out there and I will send the money to the bank and they can send me the deed and in that way whatever money is spent will be kept in the family."

Albert testified that he talked the matter over with his attorney, and that he (Albert) thought it would "look better" for him to write it himself. When pressed by both court and counsel to tell why he consulted an attorney and had him draft the letter, he became evasive. About one month later, Albert's mother executed the deed to him,

105 Neb.—51

which is assailed, before Frank J. Healy, a notary public of San Rafael, California, who testifies that she was in a deplorable condition and so weak she could hardly walk, but apparently knew what she was doing. Healy also testifies that, at the time she signed the deed, she said to him, "This is a piece of property that I have had for several years and I am now about to lose it, which I thought that some day was going to bring me quite a piece of money," and that she also said, "I will get about $200 out of this. Don't you think I ought to realize more than that after having it so many years?" After receiving the deed from his mother, Albert sent her $200, which she used in paying house rent in arrears.

It is now necessary to consider the circumstances and condition of Mrs. Anna Lavelle Chase, both before and at the time she signed this deed. The four plaintiff sons and another son, Samuel, who died after a lingering illness February 3, 1919, were born to her and Mr. Chase in California. The record shows that the family were nearly always in straitened financial circumstances; that Mr. Chase deserted them in 1908; that Mrs. Chase then took in washings, went out to houses to work, and worked nights for dinners at lodges, and baked bread and sold it; and that she continued this work until June, 1918, when she fell sick and never recovered. Thomas O'Connor, probation officer and investigator for indigents, testified that he called upon her many times, and that she received aid from the county from September 1, 1914, at the rate of $25 a month, until her son Frank began work, when it was reduced to $15 a month, which she received until she died. Her work and this county aid and the wages of the older boys, as they got old enough to work, were her only sources of income, and they lived in a rented house. From March to August, 1917, her son Frank was sick in the hospital and could not work again until April, 1918. In 1916 her little son Samuel had pneumonia and was almost a helpless invalid until his death in February, 1919. The different people for whom Mrs. Chase worked gave her

the clothing for the children, and they did not buy any. Nevertheless, on December 20, 1917, Mrs. Chase wrote to her sister, Mrs. Kate O'Connor, living near Greeley Center, the following letter:

"San Rafael, Dec. 20th.

"Dear Sister Kate: You will be surprised when you get my letter for, I am sick and would like you to come and stay with me this winter or Mary whitch one could come but I thought you could come as you children are all growin and could take a trip I am all alone that man Chase has left me eight years Francis and my self was geting along good Now I do want you to I hope that you ar all well at home I want you send a dead so I can sine It for Albert or take it alonge with you how is he geting a long I will write him soon I must ad mit I am a shamed for not doing so be foure I hope youre boy dont have to go to War for it is afel Now I want a lette saying you are coming Francis will meat you at SanFrancisco dont mind getting any thing ready I coud fix you up here With love to Johny and children from Sister Annie"

Again, on May 9, 1918, another letter was received by Mrs. O'Connor, purporting to come from Mrs. Chase. Down to the address at the close, it is in a handwriting other than that of Mrs. Chase, and not identified; but, after the closing address, and on the same sheet, it is in her own writing.

"San Rafael, Cal., May 9, 1918.

"Dear sister Kate: I am just answering your letter with disgust, to think that all these years that you've worked so hard, that you couldn't spend fifty dollars to come to see me. And the change would have done yourself the worlds of good. I was awful sorry to hear of Mary's death And if sister Julia wants to come it might be a good change for her health, for I'll be awful glad to have her, and you too if you want to come. I should think that you have girls enough to keep house for you. I would of gone back, if you would of come last January when I wanted you. But I could not go and, leave the house for Frank

was six months in the hospital, and one year sick.  Now I will break the news to you that I have four (4) boys besides Francis, the names as follows:

"Francis 19 years,

"John    16 years,

"Charles 14 years,

"Samuel  13 years,

"Ambrose 12 years.

"You needn't worry about getting back, for I'll pay your fare back, so I'll like to hear from you soon, Send Julia, if you cannot come yourself, as I would like to have one of you come.  I am going to send a lot of shoes overcoats etc., back the next week or two, hoping you can make use of them.  Hoping to hear from you as soon as possible, also hoping the answer will be one of yourselfs I remain your loving sister A. Chase (add.) Mrs. A. Chase 126 Fourth Street San Rafael, Cal. Mavin Co.  I have looked for a deied for my Place from Albert I told you to have him send one so I could sine it I feel so I want it once I hope he will tind to it at once I dont want Chase to come and take it I should have done it before Will close with Love to all hoppind God and his blessid mother will give me my helth."

Defendant argues that these letters show his mother's intent that he should have the land, and, ordinarily, that inference might be justified.  But it is to be observed that the letters are written to her sister, and not her son; that they convey the idea that she was in somewhat affluent circumstances at the very time that she was receiving charitable aid from the county.  The last letter also shows that her motive for making a deed to Albert was to prevent her husband getting the land, and also shows that there has not been very much communication between herself and relatives in Greeley county, for she "breaks the news" that she has four boys, giving their names and ages.  She had kept secret the existence of her son Albert through the years.  The inference, too, is reasonable that she was in ignorance of the value of her

land, which at this time was worth about $12,000, as compared with a very low value when she last saw it, 18 years before. These letters must be read in the light of the circumstances which surrounded her at the time. She seemed anxious to convince her sister that she was in comfortable circumstances, perhaps through a pardonable pride, when, in truth, her financial circumstances were desperate. It seems reasonable to conclude that her expressions of an intent to deed the land to Albert were no more authentic than her expressions of affluence while in the pinch of poverty. Then, too, it must be borne in mind that she could then have made a deed to Albert, but did not, and never did until after she had the letter from him of September, 1918, saying that he owned the land, which she evidently believed, since she told the notary that she was "now about to lose it" when she signed the deed. Viewed in the light of all the circumstances, these letters to Mrs. O'Connor convince us that she was professing to her sister that she was in affluent circumstances and did not need the land, rather than that she really intended that Albert should have it. Moreover, the only reason disclosed by the letters for making the deed was to put the land beyond her husband's reach. These letters are not persuasive with us that she intended Albert to have the land.

Many witnesses testified by deposition to the physical and mental condition of Mrs. Chase when she made the deed. Physically she was emaciated and had sores, and had fallen in weight from 180 to 100 pounds. Many witnesses testify to her eccentric behavior, and that she lived in practical seclusion, refusing to see neighbors and others with whom she had theretofore been on terms of somewhat intimate friendship; that, when the priest came to see her, she refused to admit him, though she had been a devout Catholic. These witnesses testify that, from their observation, she was mentally incompetent to make the deed, and none of this evidence is disputed. Her trip to the notary's office to make the deed was the only time she had been out since June preceding, and she was ac-

companied by her invalid son Samuel, who died a few months thereafter.

Viewed in the light most favorable to the defendant, the evidence clearly shows that she was suffering from such extreme mental weakness at the time she made the deed as to be readily susceptible to the positive representations contained in Albert's letter to her. His representations were that he was the absolute owner of the land, and wanted the deed only to make a good record title in him. Unless he had title by adverse possession, which will be discussed presently, these representations were wholly false. She knew, we think, that she was making a deed of her land to Albert, but she could not even consider whether the statements made in his letter were true or false. Her mental weakness was such that she could neither resist the importunity nor detect the artifice of Albert's letter. Its effect upon her weakend mind is clearly shown by the fact that she said she was " losing " her land. Her expressions to the notary show that her intent was to keep it and get " quite a piece of money " out of it, thereby indicating that she claimed to own it. Considering her mental weakness, her poverty, her ignorance of the value of her land and of the validity of her title thereto, the positive, formidable and false representations made in Albert's letter to her, the almost nominal consideration, and the improbability that she would give the land to Albert to the exclusion of her other children for whose support she had done so much, we find that the deed was not her conscious, voluntary act, and was secured by such imposition and fraud that equity requires that it be canceled. *Kleeman v. Peltzer,* 17 Neb. 381; *Jesse v. Brown,* 83 Neb. 311; *Nelson v. Wickham,* 86 Neb. 46; *Winslow v. Winslow,* 89 Neb. 189; *Armstrong v. Randall,* 93 Neb. 722; *Miller v. Wentz Co.,* 99 Neb. 286.

But the defendant, Albert J. Lavelle, claims to have acquired title by adverse possession. We think that the evidence, perhaps, shows that he exercised such dominion over the land for about 12 years that, as between strangers

Chase v. Lavelle.

and under different circumstances, would probably be sufficient to sustain his claim. But, when Anna Lavelle relinquished actual possession of this land, it was to her father, and he held it by her permission and under a perhaps unexpressed arrangement that he was to use it and pay the taxes on it. At any rate, her father's occupancy of the land was known to her and was by her permission. And the evidence pretty clearly indicates that Albert practically succeeded to his grandfather's permissive occupancy. If so, such occupancy could not ripen into title, no matter how long continued, until actual notice was brought home to the owner that the possession was adverse. *Blake v. West,* 89 Neb. 794. And the defendant gave no such notice until September, 1918, in his letter. Moreover, there is a presumption that Albert's occupancy was permissive, and not adverse. The rule is thus laid down in 1 R. C. L. 756, sec. 85: "As a general rule an adverse possession cannot be predicated on the possession of the parent as against a child, or on the possession of a child as against its parent." And in 2 C. J. 157, sec. 283, it is said: " Possession by a child of land belonging to his parent will not ordinarily be considered adverse." This text is supported by the following adjudicated cases: *Hunt v. Hunt,* 3 Met. (Mass.) 175, 37 Am. Dec. 130; *Silva v. Wimpenney,* 136 Mass. 253; *Dunham v. Townshend,* 118 N. Y. 281; *Haggard v. Martin,* 34 S. W. (Tex. Civ. App.) 660; *O'Boyle v. McHugh,* 66 Minn. 390; *McCutchen v. McCutchen,* 77 S. Car. 129, 12 L. R. A. n. s. 1140. The rule is well stated in *O'Boyle v. McHugh, supra,* as follows:

"As between parties sustaining parental and filial relations, the possession of the land of the one by the other is presumed to be permissive, and not adverse. To make such possession adverse, there must be some open assertion of hostile title, other than mere possession, and knowledge thereof brought home to the owner of the land."

This is the rule. Under it, the defendant's possession was never adverse, except for the few weeks between the

time he wrote the letter to his mother and the time he got the deed from her.  Defendant's claim of title by adverse possession cannot stand, and his statement in the letter that his occupancy was adverse was false.

It may be reasonably inferred from all the evidence that there was a sort of understanding between Albert's grandfather Lavelle and his mother that the grandfather was to have the use of the land in return for the payment of the taxes thereon, and that Albert succeeded to this arrangement.  It seems equitable to apply that understanding to plaintiffs' demand for an accounting.  So applied, the claim for rent offsets the taxes paid.  But the $200 paid by Albert to his mother, with interest at 7 per cent. from October 17, 1918, must be returned to him.  It follows, too, that the prayer of plaintiffs' petition that, if the $8,000 mortgage is foreclosed, the land involved in this suit must not be sold until the security of the northwest quarter of section 9, township 18, range 10 west, be first exhausted, must be granted.

We recommend that the judgment of the district court be affirmed in so far as it cancels the tax deed, and otherwise reversed, with instructions to cancel the deed of Mrs. Anna Lavelle Chase to the defendant Albert J. Lavelle, dated October 17, 1918, and to quiet title in fee in plaintiffs and the defendant Albert J. Lavelle as tenants in common of equal undivided shares in said land, upon the sole condition that plaintiffs pay the defendant Albert J. Lavelle the sum of $200 and interest as aforesaid, and that all costs in both courts be taxed to the defendant Albert J. Lavelle.

PER CURIAM.  For the reasons stated in the foregoing opinion, the decree of the district court canceling the tax deed is affirmed, and is otherwise reversed, with instructions to enter a decree quieting title in fee to the lands in controversy in the plaintiffs and the defendant Albert J. Lavelle as tenants in common of equal undivided shares, as above set forth, and this opinion is adopted by and made the opinion of the court.

JUDGMENT ACCORDINGLY.