# JOSÉ COGHEN Y GARCÍA

## v.

# JOSÉ MARTINEZ LLONIN.

---

San Juan, Equity, No. 499.

Coghen y García v. Llonin.

1. Twelve years after the making of a conveyance, a son secured letters of guardianship of the person of his father, and filed a bill in equity to set aside the conveyance on the ground that his father is and always was semi-idiotic and mentally irresponsible, and that the purchaser had full knowledge of this, and secured the land for an inadequate consideration, etc. Held: That the proofs did not show that the father was of such a weak mind at the time of the making of the deed as that it can be said that he did not exercise his free will, nor can it be said that the consideration paid was unreasonably inadequate, or that the purchaser had any reason to believe that he was not dealing with a free agent, and hence the bill was dismissed.

2. A court of equity will only interfere to set aside such a conveyance when the application is made seasonably.

3. In order to cause a will or deed to be set aside on the ground of fraud or undue influence, it must be established to the satisfaction of the court that the party making it had no free will, but stood *in vinculis.*

4. In equity each case to set aside a deed for the incapacity of the grantor at the time of the execution must be decided on its own merits, without regard to previous decisions in cases differing in the facts.

5. Where the alleged weak-minded person is shown not to have been regarded by his neighbors differently from other members of the community, and where he is shown to have been a volunteer soldier, to have married and raised a family, to have served as city alderman, to have testified in courts, and to have brought and defended suits, and, generally, to have conducted himself as any other citizen would, his children will not be heard, twelve years afterwards, to set aside a conveyance which he made for a reasonable consideration.

6. Where the alleged evidence of medical experts as to the sanity of a person, on opposite sides of the case, is irreconcilably conflicting, the court will discard the whole of such alleged evidence, and resort to the record evidence and written instruments in the cause, and its own observation of the subject, and its examination of him in open court,

NOTE.—*Deeds; fraud.*—As to fraud and undue influence in avoidance of deed or will, see note to Harding v. Handy, 6 L. ed. U. S. 429.

As to when deed set aside for weakness of mind or imbecility of grantor, see note to Allore v. Jewell, 24 L. ed. U. S. 260.

Coghen y García v. Llonin.

in order to determine what his mental condition was at the time he is alleged to have made the conveyance in question, some twelve years previously.

Memorandum filed July 10, 1909.

---

*Messrs. Hartzell & Rodriguez Serra,* attorneys for complainant.

*Mr. Charles M. Boerman,* attorney for respondent.

Rodey, Judge, delivered the **following** opinion:

This is a bill in equity filed September 17, 1907, by the complainant, José Coghen y García, who is twenty-eight years old, as legal guardian of his father, Juan Coghen y Campos, who is sixty odd years of age, and who is alleged to be an insane person, to recover 400 cuerdas of land for which the father, as it is alleged, while thus insane or weak-minded, made a deed to the respondent, José Martinez Llonin, on September 7, 1895, or twelve years before the filing of the bill. It is alleged in the bill that said Juan Coghen y Campos has been insane or weak-minded all his life, and that such fact was well known to the respondent when the latter received the deed in question from him, for the alleged inadequate consideration of 2100 pesos, for a property that is alleged to have then been worth about five times that amount, or 10,000 pesos. The land is situated in the barrio of Monacillo in the municipal district of Rio Piedras.

The cause came on for trial before the court alone, without

the intervention of an examiner or master, on April 15th and 16th, 1908. On the latter date, after we had heard the case in chief and a portion of the evidence for respondents, we felt convinced that there was no merit in the bill, and dismissed it with costs against the complainant. However, counsel for the complainant, feeling aggrieved at this action, made a respectful but forceful application to the court, and supported it by a brief and argument which induced us, under date of May 4, 1908, to reinstate the cause for further hearing.

Thereafter, on May 7, 1909, the trial was proceeded with as before, when additional testimony was taken and additional exhibits introduced. Within the following month, counsel for the respective parties filed briefs, which are now before us. The stenographer having written out all of the testimony and arranged the exhibits, and we having read and examined all of the same, as well as the briefs, the matter is now before us for findings of fact and law, and final disposition on the merits. We have given the evidence and the briefs of counsel very careful attention, because of our action as aforesaid in having dismissed the case at one time during the trial.

The complainant, José Coghen y García, only applied to the insular district court for letters of guardianship over his father on August 17, 1907, or just one month before the bill of complaint was filed. The record in the case is quite voluminous, consisting, apart from the pleadings and briefs, which are lengthy in themselves, of 175 pages of testimony and many exhibits, consisting of deeds, leases, certificates, contracts, etc., etc., some of which are quite lengthy. It would therefore be useless to refer to them with much detail, and we think it better,

as the whole case is fresh in our mind, to state what the facts substantially are, which we do as follows:

It is undisputed on the evidence that José Coghen y Campos, the alleged insane person, lived on and in the vicinity of the land in question since his father brought him there from Spain, when he was about five or six years of age, for many years, up to the time of the making of the deed in question and for some time thereafter. After thus growing to manhood, he got married and raised a family of five or six children. His wife, according to the evidence, was an intelligent woman. It is also in evidence, though disputed, that he attended to such daily duties as he had to perform, looked after the plantation to some extent at least, and that he made and sold charcoal, took cattle on shares to pasture on the plantation, from different people including the respondent, and settled his accounts regarding the same from time to time with the bailors; that he was sued by different persons and defended the suits, testified in his own causes in the courts, and took appeals from decisions against him; that he served for from seven to nine years as alderman of the town of Rio Piedras, and at one time was vice mayor; that he served as judge of election at some of the elections in his district during Spanish times, and was a member of one of the political parties of the day, and there is some little evidence tending to show that he was considered as a politician of some prominence in his vicinity. Some two or three years before he made the deed in question, he received a quite considerable herd of cattle from the respondent, José Martinez Llonin, to pasture on shares and produce beef therefrom, and in their dealings the said Juan Coghen y Campos became indebted to the former in about 800 pesos. It seems that Llonin pressed him for payment

of this money, and Coghen, not having any cash with which to pay, offered the plantation in satisfaction, receiving from Llonin about 1200 pesos in cash,—both amounts, the cash and the debt, making, as testified by Llonin, with other expenses, the 2100 pesos consideration for the plantation, or an average of a little over 5 pesos per cuerda. There is much conflict of evidence on this point. Coghen's side alleges that he never received the cash, but received Llonin's notes; but the latter denied this emphatically, and asserted that he paid him the actual cash. However, it is certain that less than a month after the making of the deed between the parties for the land and the recording of the same, Llonin gave a three-year lease of the plantation back to Coghen at a hundred pesos per annum, receiving his rent in advance. There was also inserted in this lease a clause giving Coghen the right, during the three-year period of the life of the lease, to repurchase the entire plantation at the original selling price to Llonin of 2100 pesos. Thereafter and some time before the expiration of the three-year term of the lease, Llonin purchased a waiver of this right to purchase the entire plantation from Coghen, and paid him therefor the 300 pesos, the same amount he had received for the entire lease.

It is pretty certain from the evidence, conflicting though it is, that after this the parties to the transaction became estranged, and Llonin ejected Coghen from the plantation. It is also in evidence that Llonin purchased some outstanding notes of Coghen from a woman in the neighborhood and brought suit thereon, that he purchased these notes, which amounted to over 1200 pesos, for one half their face value, and in the suit he brought to recover on them attached about everything Coghen had in the way of personal property, although there is evidence tending

to show that he did not recover quite 200 pesos in the suits. It was contended that Llonin did this as an offset to the note he owed Coghen, but the proof in this regard utterly failed.

A good deal of immaterial evidence crept into the case tending to show that about this time the feeling between the parties was quite bitter and that they brought cross suits of different kinds against each other.

It is probably true, as appears from the evidence, that the land in question, although occupied by Coghen and his father for many years, had no registered title. In fact, it is in evidence that Coghen, the alleged insane man, got title to it simply by being sole heir to his father, and that before he made the deed to Llonin, and probably at the latter's request, he applied for and secured an expediente posesorio therefor, from a proper tribunal, so that the same could be registered and his deed thereunder to Llonin be recorded. It is also in evidence that Coghen's father, years before, had made some sort of a deed, transfer, or mortgage of this same place to one Oteiza, and that the latter, some years after the deed from Coghen to Llonin, made some effort to recover the land under this transfer in the insular courts, but failed. This fact, it is contended, accounts for the probable bias of some witnesses for the complainant. In other words, that their testimony is colored by their chagrin at thus failing.

We have seldom known a case that better illustrates what has often been judicially stated, that physicians, when testifying against each other as experts, appear to be at times as biased as are mining experts for opposite parties to a mining controversy in the western states. In the case at bar, two or three physicians were called on each side, whose names it is

Coghen y García v. Llonin.

not necessary to set forth in this opinion. Those for the complainant, couching their language in bewildering professional terms, testified in substance that the alleged insane man, Juan Coghen y Campos, exhibits on his cranium evidence of being an imbecile and a semi-idiotic individual; and that this is evidenced by the shape of his head, the angle of his jaw, the look of his eye, his general demeanor, and the depressions in the skull where the bones should have joined after birth, which it was claimed they did not do, etc., etc. They illustrated their theories by demonstrations before the court, and by striking the subject on the shin and other parts of the body, to show that there was no reflex action from the blow such as resulted on a healthy person, as they illustrated by other subjects in the court room. These physicians, when shown transcripts of evidence that the subject had given years ago in courts of justice, in some instances, in substance, denied that the evidence was anything save what would be given by an imbecile, and in others stated, in a negative sort of way, that they did not believe he gave such testimony.

On the other hand, the physicians for the defense examined the subject before the court, and with equal vehemence testified that, while he was not a man of scintillating brilliancy, he had common sense, and that there was nothing in or about his head or skull that would of necessity make him an imbecile; that there were in fact no depressions in the skull, but elevations in some places, which, by contrast, showed only apparent depressions in others, and that it was their opinion that he was now, and always had been, a man of at least moderate common sense. A very few of the man's neighbors who lived beside him all his life, on the one side, came in and testified that he had always

Coghen y García v. Llonin.

been considered a weak-minded person; and members and serv-
ants of his own family testified that his father sent a servant
around with him for years to take care of him when he went
away from home, etc.   On the other hand, many people who
had known Coghen for a great many years testified that they
never heard it said in the community that there was anything
wrong with him mentally, and that in fact such a claim was
never talked of until about the time of the filing of this suit;
that he had always attended to his business like anybody else
in the community.   Men who had served with him in the munici-
pal council and on the election board, and who kept store in
the town where he lived, and who had seen him as a volunteer
soldier in Spanish times, testified that there was nothing wrong
with him, and that he was a quiet and respectable citizen, and
that they never heard anybody say that there was anything
wrong with him.   Some of the witnesses on cross-examination
admitted that he was rather dull, but would not say that he
was not able to attend to business matters.   The present mayor
of the town came and practically testified to the **substance of**
all the aforesaid facts.

Several times during the trial, we felt like deploring the fact
that witnesses should testify in such direct and positive conflict,
and we here refrain from commenting on the same other than
to say that in such a case the court must, of necessity, resort to
the written evidence, which establishes facts that cannot be dis-
puted, and to its own knowledge of human nature, as well as
to its own observations of the subject of the inquest, who was
present and testified himself.   We must also take all the facts
and circumstances into account, and apply the law to the whole.

It is fortunate for all lawyers and all other courts of the coun-

try that the Supreme Court of the United States, when an important subject comes before it, usually treats the subject thoroughly, and leaves no doubt as to what the rule is that should obtain, and brings the citations down to the date of the opinion in the case being considered. We think it has done so on the subject we are here considering, in the case of Allore v. Jewell, 94 U. S. 506, 24 L. ed. 260. It is shown there that the text writers and the courts sustain the doctrine set out in the first paragraph of the syllabus of that case, as follows:

"Whenever there is great weakness of mind, though not amounting to absolute disqualification, arising from age, sickness, or any other cause, in a person executing a conveyance, and the consideration given for the land is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party or his representatives or heirs, interfere, and set the conveyance aside."

It also appears from an examination of the authorities that, while lapse of time cuts some considerable figure in cases of this character, as governing the right of complainants to the relief sought, yet courts of equity often lend their aid where there is reasonable excuse shown for the delay, and the fraud is palpable.

It seems to us, from the examination we have made, and our knowledge of the actual facts gained at the trial and from the record, that the complainant here should be required to prove, first, that his father, Juan Coghen y Campos, was of such a weak mind at the time of the making of the deed in question as that he cannot be said to have exercised his free will; and next, he should be required to prove that the consideration paid for the land was unreasonably inadequate. This, of course,

coupled with proof of respondent's knowledge of such facts, and proof of undue influence, if any, of the respondent over the alleged insane person who made him the deed, would, in the absence of any circumstances that would render the granting of the relief unreasonable, certainly entitle him to recover, and certainly so in a case like this, when the land is still in possession of the original vendee.

From the evidence and the record taken as a whole, we have no hesitancy in finding, as we here do, that Coghen was not, at the time of the making of the deed, in such a weak condition of mind as ought, at this late date, to induce the court to grant the relief here requested. Neither do we think that the consideration was so inadequate. There is evidence on both sides of the case on that subject. Some of it tends to show that the land was in fact worth 8 or 10 pesos per cuerda, or even slightly more, at the time; and other evidence for the defense, equally positive, shows that it was not then worth more than 6 or 8 pesos per cuerda, at the most. The selling price in the deed that is in controversy was, as stated, at an average of about 5 pesos per cuerda for the entire tract. It was shown that the land had a few small patches of coffee on it and the ruins of an old house, but as a general thing it was only used or fit for pasture at the time. The evidence also tends to show that respondent, Llonin, has put probably five or more thousands of dollars worth of improvements on the place since he has been in possession of it. Of course, since American occupation of Porto Rico, and the recent great increase in the value of land on the north side of the island and particularly in the locality in question, it is undoubtedly the fact that the land now is worth a great deal more than it was at the time of the making of the deed in con-

Coghen y García v. Llonin.

troversy. In fact, this relatively sudden rise in value may have been the main inducement for the securing of the letters of guardianship over Coghen and the filing of the suit. Indeed, it was confessed by counsel for complainant on the trial that the letters of guardianship were secured for the express purpose of bringing the suit. The excuse given all through the trial, for not filing this suit sooner, was that Coghen's family were so poor they could not afford to employ lawyers. We think the evidence established the fact that the family was indeed very poor, especially since being dispossessed of the plantation in question. We further think the evidence does in fact show that Llonin was, at a date subsequent to the acquisition of the land, rather harsh with this family, and there is some evidence tending to show that his prosecution of one of the older sons resulted in the latter's leaving for Santo Domingo, and dying there for aught that was ever heard of him. He was a fugitive from justice when he left, but it is not clear that this particular prosecution was brought about by Llonin's action. Llonin on the stand testified that his complaint against the son was for actual theft of his cattle by the young man.

It is in evidence that Coghen's father made a will leaving his said son as his sole heir, and through this will the latter inherited the land, or at least the right to the possession of it that his father had, even though the title was not registered. Now it is indeed strange, if the son was so incapacitated or mentally weak that his deed should be set aside, that his father, who was in the accounting department of the provincial government, and evidently a man of at least some education, would not have known it, and have provided for a guardian for him in the will. It is also strange that Coghen's wife, who lived for

Coghen y García v. Llonin.

some time after being dispossessed, did not take steps to have something done about setting the deed aside, and it is stranger still, if she was in fact an intelligent woman, that she should have married such an imbecile as he is claimed to have been at all. Some of the children are over thirty years of age, and for many years back have been of age, and could have brought an action to correct this wrong and fraud, if it is such, and surely they could have induced someone to aid them in that regard.

It must not be forgotten that, although this son of Coghen recently applied to the court, and, on the testimony of these same medical experts who have testified against him here, secured letters of guardianship over him, still the alleged insane person has never been committed to an asylum or required to change his domicil or his conduct in any way, but presumably lives with his family the same as before. The mere fact that the insular court appointed a guardian for Coghen on the *ex parte* evidence of these experts cannot, of course, be considered as sufficient of itself to induce us to assume on this trial that he was of such weak mental capacity at the time of the making of the deed as that we should set the deed aside. Indeed, from the evidence before us and the appearance of the subject himself, we doubt very much if the insular court would have granted the letters of guardianship had the matter been controverted there with other expert medical evidence and facts, as was the case here.

Our own observation of the man shows us that he is a sort of simple-minded individual with a not very good memory, and from the evidence we judge that he has probably grown somewhat less intelligent in these later years than he was when he was younger, but, having seen him testify and read his tes-

timony given years ago, we do not think he is mentally of that character that induces courts to regard him incapable of making conveyances. All the other facts show that no great advantage was taken of him, and that this suit is probably not entirely based upon a just sense of wrong, but more on the hope of gain.

It will be remembered, also, that there was a period when Llonin had leased the land back to Coghen, when the latter had the right to repurchase the whole plantation from him for the same amount which Llonin had paid for it. Yet this was not taken advantage of by the Coghen family or anybody in their interest. The fact that they had such right would indicate that Llonin did not think he had received such an advantageous bargain.

We do not think, therefore, that the evidence discloses any case of deception or fraud practised upon a person of weak intellect, and a conspiracy to obtain his property for a consideration so grossly inadequate, as to, under all the circumstances, warrant the intervention of a court of equity at this late day to set the deed aside. We think this conclusion is fully sustained by the decision of the Supreme Court of the United States in Griffith v. Godey, 113 U. S. 89, 28 L. ed. 934, 5 Sup. Ct. Rep. 383. The opinion in that case is profitable reading on the subject we are here discussing. As was well said in Conley v. Nailor, 118 U. S. 127, 30 L. ed. 112, 6 Sup. Ct. Rep. 1001:

"In equity each case to set aside a deed for incapacity of the grantor, or intoxication at the time of execution amounting to incapacity, must be decided on its own merits, without regard to previous decisions in cases differing in the facts."

And it is further held in that case that "in order to cause a

Coghen y García v. Llonin.

will or deed to be set aside on the ground of fraud and undue
influence, it must be established to the satisfaction of the court
that the party making it had no free will, but stood *in vinculis.*"

An interesting and more recent case on the subject of setting
aside deeds for incapacity of the grantor and fraud of the
grantee is that of McIntire v. Pryor, 173 U. S. 38, 43 L. ed.
606, 19 Sup. Ct. Rep. 352. In this latter case the subject
is also considered at considerable length. There was a good
deal of evidence in the case at bar about Llonin being municipal
judge, and bringing his own cases in his own court against this
Coghen family, but the latter flatly denies this, and there is no
proper evidence of it to overcome his denial. Besides it is large-
ly immaterial. Whilst there was considerable evidence tending
to show that Llonin did not pay this 1200 pesos in cash, in
addition to the 800-peso debt, as a consideration for the land,
the proofs wholly fail to establish that fact against the deed
itself and the sworn testimony of Llonin on the stand. In the
face of the fact that Coghen received the benefit of the 800-pesos
debt, which he undoubtedly owed, and that he and his family
no doubt received the benefit of the 1200 pesos, which Llonin
undoubtedly paid, as we find, and in the face of the fact that the
deed in question was made before a notary, with neighbors of all
the parties as witnesses, and in the light of all the evidence
in the case, we cannot see that this is a case where a court of
equity ought to interfere. On the evidence we are firmly of
opinion, and so find, that there was no fraud or deception in or
about the obtaining of the deed; that the consideration was duly
paid, and that Coghen was not so weak-minded at the time of
the execution of the deed as should induce the court to interfere.

Therefore a proper decree embodying these findings of fact

and law, and dismissing the bill, with costs, will be prepared and entered.