CRABB et al. v. WATTS et al.

(District Court, D. Oregon. March 25, 1918.)

No. 7340.

1. DEEDS ⬪76—VALIDITY—UNDUE INFLUENCE.
　　Where deeds have been obtained through undue influence, the grantee is not entitled to derive advantage therefrom.

2. DEEDS ⬪72(1)—UNDUE INFLUENCE—VALIDITY.
　　To have a deed vacated on the ground of undue influence, it is not necessary to show that the grantor was insane, or in a state of mental im-

becility; but it is sufficient to show that he was in condition of mental weakness and there was a gross inadequacy of consideration, from which circumstances imposition or undue influence will be inferred.

3. DEEDS ⊚⟶196(3)—VALIDITY—FIDUCIARY RELATIONS.

The existence of a fiduciary relation between the grantor and those securing a benefit under a deed raises a presumption against validity, and casts the burden of proof on those asserting the regularity of the transaction.

4. DEEDS ⊚⟶211(4)—UNDUE INFLUENCE—SECRECY.

Where a deed is attacked as having been obtained through undue influence, the secrecy with which the transaction is accomplished often furnishes a badge of fraud.

5. DEEDS ⊚⟶196(4)—UNDUE INFLUENCE—BURDEN OF PROOF.

Where a grantor, who was a very aged man, a few days before his death conveyed all of his lands to the wife and daughter of one son, and such conveyance was contrary to his previous expressed desires, and was made a few days after he had of his own volition destroyed a will which gave the grantor's two sons a larger share than his other child, a daughter, those facts alone cast on the grantees the burden of proving that the deeds were the free and voluntary act of the grantor.

6. DEEDS ⊚⟶211(4)—UNDUE INFLUENCE—EVIDENCE.

In a suit by a daughter of a grantor to set aside deeds executed only a few days before his death, whereby the grantor conveyed all his estate to the wife and daughter of one of his sons, evidence *held* to show that the deeds were the result of undue influence.

In Equity. Bill by Jerusha Crabb and John Crabb, wife and husband, against Homer I. Watts and others. Decree for complainants.

James A. Fee, of Pendleton, Or., and A. S. Bennett, of The Dalles, Or., for plaintiffs.

Will M. Peterson and Raley & Raley, all of Pendleton, Or., for defendants.

WOLVERTON, District Judge. On April 14, 1914, Thomas J. Watts signed two deeds by his mark, one purporting to convey to Jennie Anderson Watts 120 acres of land, and the other to convey to Vernita E. Watts 320 acres, all in Umatilla county, Or. The instruments were acknowledged before Homer I. Watts, notary public. The plaintiff Jerusha Crabb, who is a daughter of Thomas J. Watts, and her husband, John Crabb, feeling themselves aggrieved, are seeking by this controversy to have these deeds annulled, on the grounds: First, that the grantor was at the time incapacitated to make the deeds; and, second, that he was induced to make them through undue influence exerted by the defendants Homer I. Watts, Marvel Watts, Jennie Anderson Watts, and Vernita Watts. Homer and Marvel are the sons of Thomas J. Watts, and are his only children and heirs at law, except the plaintiff Jerusha Crabb. Jennie Anderson Watts is the wife of Marvel, and Vernita is their daughter.

Thomas J. Watts died intestate, on April 20th, six days after the deeds were executed. He was in his eighty-third year at the time of his death, and had grown very feeble, both physically and mentally. When in health and vigor, he was a man of positive habits, and asserted his own judgment in his dealings with others. The last few years

⊚⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of his life, when his health had become somewhat impaired, he leased his lands to his sons Homer and Marvel on shares, and they accounted to him for his share in the crops. Marvel, perhaps generally, sold his grain, and either passed the proceeds to him or to the bank to his account. He also paid his taxes and transacted other business for him when he was away. There was therefore this fiduciary relation existing between Homer and Marvel Watts and the deceased.

Deceased was twice married. Jerusha Crabb is the daughter of the first wife, and Homer and Marvel are the sons of the second, making them half-brothers of Jerusha. When she was 6 years old, Jerusha went to live with her uncle, Marvel Watts, and shortly afterwards—within a year— the deceased married a second time. Jerusha continued to live with her uncle until she was married to Crabb. In the meantime she saw and visited with her father, and he with her, occasionally. When her uncle died, she shared in his estate, finally realizing therefrom $10,000, less a considerable expense in obtaining the money. The net amount that she finally received was around $9,000. After her marriage, she kept in touch with her father, through meeting him occasionally and correspondence, down to the time when the deceased and his second wife were divorced, which was in the year 1908. After that the deceased visited with Jerusha frequently, and at times he made his home with her, extending over periods of from a week to three months. In the latter 3 years of his life he wrote to her very frequently, and for some periods as often as once every week. Generally, however, after his divorce, he made his home with his son Marvel, in Athena, Or. Some of the time he was in Southern California, on account of his health. At other times he stopped in Spokane, and with Mr. Skelton, near Kennewick, Wash. In this way he went about as he desired, having practically retired from active business.

In the fall of 1913—late fall, perhaps—the deceased went to Santa Ana, Southern California, and remained there until the latter part of February, 1914. His health failing, so that he could not care for himself as he wished, he wrote to Jerusha, saying in effect that some of them would have to come after him. Mrs. Crabb wrote to her brother Marvel about it. About the same time Page, a friend of deceased, wired Marvel to come for him and bring him home. Marvel went for his father and brought him back. He thinks they returned the latter part of February or first of March; he was not able to fix the date. The deceased was taken to Marvel's home. Marvel is of the impression that some time later his father received a letter from Jerusha, but is not sure about it. At least, he did not read the letter, and did not know its contents. Mrs. Crabb makes no mention of having written such a letter. Marvel says that on March 16th or 17th he took "father up there [to Jerusha's] at my own father's request." Jerusha says it was the 17th that they came.

The Crabbs lived near St. John, Wash. When the deceased came there, he was quite feeble, and unable to move about without support. The next morning, or the day after he arrived at his daughter's home, in talking about his business and property, he told her that he had made a will, and requested her to send for it, giving as his reason

that he "didn't want it; it didn't suit him." The daughter had no previous knowledge of his having made a will. She declined to send for the will as requested. Deceased then asked her husband to send for it, and he also declined. He then requested W. D. Parker, a neighbor, to write for it. Parker wrote to Mr. Fay Le Grow, cashier of the First National Bank of Pendleton, who had the custody of the document, to send it up to the old gentleman. This was on the 24th of March. The will was forwarded, and was received by the deceased on the 27th. Watts signed a confirmatory letter of that date, and dated the same in his own hand. When the will was received, without opening the envelope in which it was sealed, he requested his daughter to put it away, which she did. Shortly afterwards—a few days—he asked her to get the will for him. He then opened it, and read it, and asked his daughter to burn it. This she declined to do; but at the suggestion of Viola Crabb (now Wheeler), a daughter of Mrs. Crabb, he put the will in the stove himself, and it was burned. Viola opened the stove for him, and helped him up, and he dropped the paper in.

Unknown to deceased, Mrs. Crabb read the will over his shoulder. It bore date October 25, 1910, and gave to Mrs. Crabb $200, and the remainder of the property to Homer and Marvel Watts, share and share alike. The record shows that deceased had executed two other wills prior to that one. One of them was executed in 1899. By this will he gave to his wife the place he had in Athena, and 160 acres of land besides, some money, perhaps $100, to Mrs. Crabb, and the remainder of his property to his three boys, to be divided equally among them. There were then three sons living. The other will was executed November 25, 1905. By that he gave to Jerusha $10, and the remainder of his property to his wife and his two sons, Marvel and Homer. The bequests in these several wills seemed to be in accord with declarations the testator had made from time to time to his friends and persons of his acquaintance, running down to near the time when he went to his daughter's. When the will was destroyed, deceased gave expression to his thought, "Now it is done, and they will all share equal." This is what Mrs. Wheeler understood him to say. Mrs. Crabb understood him to say, "Now it is done," with a laugh, "you shall have your share equal." These were the only two witnesses to the incident.

On the 3d of April, Mr. Watts was taken seriously ill, and Dr. McIntyre was called. His trouble was sciatica in the right leg and bladder affection. Dr. Mitchell was called into consultation, and an anæsthetic was administered before he was relieved. Dr. McIntyre is not certain as to the day the consultation took place and the relief had, but is of the impression that it was not long after he was first called. The deceased was left in a greatly weakened condition physically, and thereafter had to be taken from and put to bed; he was unable to feed himself, and, to a certain extent had lost the use of his hands.

Marvel, with his mother, wife, and daughter, went up from Athena to visit his father on the 3d of April. This was on Friday. The mother and daughter returned on Sunday, and Marvel and his wife remained until Monday. Considerable conversation was had among

them and with the old gentleman. This will be referred to later. Mrs. Crabb told Marvel, soon after his arrival, that the old gentleman had destroyed his will. Marvel is of the belief that she said it was destroyed that morning, the 3d; but Mrs. Crabb denies that she told him it was destroyed that morning, for, she says, it was destroyed some days before—Monday, Tuesday, or Wednesday before.

Marvel went back to the Crabbs' place on the Friday following, being the 10th of April, and brought his father down to Athena the next day, the 11th. The father was carried from his bed to an automobile, and taken to the railroad station, some 7 or 8 miles distant, where he was put on an improvised stretcher or cot, and carried in the baggage car of the train to Athena, a distance of some 140 miles. On his arrival at Athena, he was taken on a dray to Homer's home. Mrs. Carden was called the next day to nurse him. On Sunday his divorced wife came over from Walla Walla to see him.

Now we come to the incident of the execution of the deeds. Homer relates that he heard part of the conversation between his father and mother; that his father wanted to provide further for his mother, but that she finally said:

"Now, Tom, I don't know that I care about the property at all. The children that have made it are entitled to it, and I would just let it go that way."

Homer further relates that, on the evening his father came to his (Homer's) home, he had a talk with him, and, after alluding to the destroying of the will, his father said:

"I have made up my mind that I am going to do with my property as I suggested some time ago; that is, going to give a part of it to your mother, and I am going to provide for Vernita, because she is a cripple, and Marvel's wife, and the balance of it I am going to leave to pay up the debts, and I hope you children will all get good friends, because you all have enough property. Now, let property not divorce you children any longer."

Homer further relates that, on Sunday evening or Monday morning, his father directed him how to make the deeds, and then said to him:

"Now, Homer, Jerusha understands how the property is to go and why she is not getting any of it, because it has been a mutual understanding that she got her property from Uncle Marvel; and Marvel will have no objections at all, because it goes into the family. * * * I think you children can get along better than you have in the past."

Homer replied:

"You know I have made my way so far, and I am going to make it the rest of the way; but * * * I would prefer to have somebody else write the deed."

To this the father said:

"Now, Homer, you are the only one that is going to cause a lawsuit in this matter, and I want you to attend to it for me, and attend to it right."

And Homer said:

"I will not cause a lawsuit in this matter, if I don't get a pleasant look from this time out. * * * If you don't want any trouble, I will cause none."

Further on he quotes his father as saying:

"I have made up my mind what I am going to do with my property. * * * Now, Homer, I am not going to leave any of you anything, so you will have nothing to law about."

On Tuesday morning, about 11 o'clock, Homer took his father out in his automobile for a ride. They stopped at the drug store in the town to get some medicine, and then proceeded on to the town of Adams, about five miles distant. On returning to the house, Homer testifies that his father said:

"Do you care if you drive me out to the ranch?"

They started, but, having driven part way out, his father told him that he would not be able to stand the ride, and so they returned to the house again. He was taken in the house, given something to eat while sitting in a chair, and then put on the bed. Homer then went to his office and drew the deeds, and returned to the house with Guy Jonas. Mrs. Carden, the nurse, had, either at that time or previously, signified her intention of going to her own home on some errand, and Homer told his wife to take her home in the car. This she did, and then took a ride, returning in 45 minutes or an hour later. Shortly after they left the house, Homer says, his father asked to be taken up. He and Jonas took him out in the sitting room and set him in a chair. The deeds were then read to him, and he signed them by making his mark; the pen being in the hands of Homer, the old gentleman touching it as the mark was made. The three persons—Homer, his father, and Jonas—were all that were in the house at the time. The old gentleman died the Monday following, at the hour of about 8 o'clock in the morning, and the deeds were recorded at 11:20 and 11:25 o'clock of the same forenoon.

This is the story which terminated in the execution and recording of the deeds. Now, to return to the time that the deceased was at the home of the Crabbs, in order to ascertain his predisposition in disposing of his property after burning the will. He talked a great deal about his property before destroying the will, and was given to much repetition of what he had previously said on the subject, indicating that he wanted his daughter to share with the boys in what he had. At times he would shed tears, and was unable to control his feelings. After the will was destroyed, he seemed to be more resigned. When Marvel came to take him away, he at first did not want to go, but became reconciled to going. Mr. and Mrs. Crabb were also not willing that he should be taken away, but yielded, in consideration that it was thought that he would be better taken care of in Athena. The care that was taken of him while at the Crabbs' was not essentially different from that accorded to him at Homer's home, except that a nurse attended him at the latter place. The Crabbs, however, were willing to provide a nurse for him, and would have done so if he had not been taken away. Marvel went to the Crabbs' with the express purpose of taking him away, and dominated the situation. He was asked:

"Now, you insisted, then, on taking him away, did you?"

To which he answered:

"Why, I went up after him; yes. Q. What say? A. I went up after him. Q. Well, I say you insisted on taking him away? A. Well, I did take him away."

Dr. McIntyre thought it best that he be not removed, but yielded, as did Mr. and Mrs. Crabb, on the representation that he would be better taken care of in Athena. The deceased seemed to be apprehensive that Marvel had designs inimical to his (deceased's) wishes respecting his property. This appears from the conversations that took place between him and Marvel on the evening before and the morning on which they started for Athena. Two of these conversations were overheard by Mrs. Wheeler, and in the main by Mrs. Crabb, and the other by both, and by Mr. Crabb. In the first conversation he said, in effect, that he would not sign any papers; that, if Marvel was taking him away to sign any papers, he would not go; and that he wanted the property to be divided equally among them. To this Marvel answered:

"It will be as you want it."

Mrs. Crabb's rendition of the conversation is that her father said:

"Marvel, if you have come after me to take me down to make any papers, or sign any papers, 1 won't go e'er a step."

To this Marvel answered:

"Father, we have no such intention as that. It shall be divided equal. 1 won't influence you to sign anything," or words to that effect.

At another conversation, while Mrs. Crabb was in the kitchen, she and her daughter overheard her father ask Marvel if he would see that the property was divided equally between "us three, Marvel, Homer, and myself." And Marvel said he would see that it was done, and asked his father, "What makes you worry that way?" or "about it," or something that way. A little later Mr. Crabb was called in, and the old man took him by the hand, and said:

"John, you and Jerusha has been so kind to me, on my word and honor, I want Jerusha to have her one-third of the property, and I want it divided equal."

Then they took him out to the automobile, and he was taken to the station.

Marvel denies that these conversations took place, but I am impressed with the truth of the statements. Apart from the testimony above alluded to, Parker, a disinterested witness, relates that, at the time the deceased asked him to write for the will, he told him (Parker) that he was not satisfied with it (the will), and said that Jerusha was his child, the same as the boys were, and he wanted her to have part of his property.

Much has been said about the condition of deceased's mind from the time that he was taken ill until he was taken away from the home of the Crabbs. Dr. McIntyre's statement for this is as follows:

"I don't believe, if he had been left to his own initiative, that he could have very well planned out anything that was at all complicated, at any rate."

The doctor was of the opinion, from the time he first saw him, that he could not survive his illness. Dr. Sharp, who attended the deceased after he was taken to Homer's, says that he was very feeble, weak, and exhausted; that he seemed to have had a general breakdown, but seemed to be perfectly rational, and so continued up to about Thursday or Friday. From that time on he was delirious.

Dr. McIntyre, from the time he was called in to see deceased at the Crabbs', administered a strong stimulant, consisting of strychnine, under which he would revive and seem brighter until its effects were lost. The same stimulant was continued under Dr. Sharp's treatment. On Wednesday or Thursday the patient began to show symptoms of pneumonia, which continued to develop until the time of his death. For this trouble an expectorant was administered.

Mrs. Carden, the nurse, says the deceased was rational up to the day he took the automobile ride, and perhaps a day or two subsequently; that he seemed pretty bright on Sunday, but that she never talked much with him, and could not say whether he was in a condition to transact important business. Other witnesses, neighbors of his, seemed to think that his mind was not impaired.

Several witnesses have given evidence to the effect that Watts had from time to time given expression to his attitude respecting the final distribution of his property, and that, generally, his thought seemed to be that while his wife was alive she should be provided for, to the extent that she should have plenty to supply her wants; that, Jerusha having obtained from her uncle Marvel a considerable sum, she was provided for substantially in accord with what his sons would have by an equal division of the estate between them, and that he was solicitous that they should have the residue of his estate after his debts were paid. But, among all the witnesses produced, only two have given evidence of any expression of Watts that would seem in the least to indicate that it was his intention to give any of his property to Marvel's wife and daughter; that is, other than what Homer has to say about the subject. Marvel says that, along in the summer, before his father went to California, while they were out at the ranch, his father asked him what he thought about remembering his (Marvel's) wife, and that he replied:

"Well, daddy, it is just up to you. Do as you like."

And Taylor testified that the old gentleman indicated to him that he was not satisfied with his will (the one that was destroyed), and in that connection said that:

"Marvel's wife would crawl on her hands and knees up the stairs to wait on him."

There is some testimony to the effect that the deceased had gotten the idea that Homer was not treating him as he should; that he did not come to see him as he thought he ought. Taylor speaks of this, and Dr. Sharp gives expression to some such idea.

Another matter that should be mentioned: When Homer took his father out for the ride on the day the deeds were executed, the father

was averse to going, but consented finally. Homer himself testifies as to this as follows:

"I took him down town the one time. Q. Just the one time? A. Yes; against his wishes. Q. What say? A. Against his wishes. Q. You took him against his wishes, you say? A. Yes."

Dr. Sharp advised against it, and thought he ought not to go; that, in his weakened condition, he was not able to stand it.

[1, 2] The legal principles involved are not intricate, nor difficult of application. Where deeds are obtained by the exercise of undue influence over a man whose mind has ceased to be a safe guide to his actions, it is against conscience for him who has obtained them to derive any advantage therefrom. Harding v. Handy, 11 Wheat. 103, 125, 6 L. Ed. 429. But it is not necessary, in order to secure the aid of equity, to prove that the grantor was at the time insane, or in such a state of mental imbecility as to render him entirely incapable of executing a valid deed. It is sufficient to show that, from sickness and infirmity, he was at the time in a condition of mental weakness, and that there was gross inadequacy of consideration for the conveyance. From such circumstances, imposition or undue influence will be inferred. Allore v. Jewell, 94 U. S. 506, 510, 24 L. Ed. 260.

[3, 4] A fiduciary relation existing between the grantor and those concerned in securing a benefit under the terms of the grant raises a presumption against validity, and casts the burden of establishing good faith upon the person asserting the regularity of the transaction. Clough v. Dawson, 69 Or. 52, 60, 133 Pac. 345, 138 Pac. 233; Jenkins v. Jenkins, 66 Or. 12, 17, 132 Pac. 542. And the secrecy with which the transaction is accomplished often furnishes a badge of fraud. Wolf v. Harris, 57 Or. 276, 279, 106 Pac. 1016, 111 Pac. 54.

[5, 6] The deeds in question were in reality executed causa mortis. It is hardly probable that any one of the participants engaged in the consummation of their execution believed that the father could survive for more than a short time. The deeds purport to have been given for the consideration of love and affection, and $1. While it may be conceded that the deceased was possessed of sufficient mentality for the final disposition of his property among his kindred, yet it cannot be denied that he was in a greatly weakened and debilitated condition, both physically and mentally. Dr. Sharp, his old physician, says "he was very feeble, and weak, and exhausted," and had suffered a general breakdown. It is not doubted that a person in such a condition is readily susceptible to extraneous influences.

Now, we have the fact satisfactorily proven that he burned his will of his own volition, and that his declared purpose in doing so was that his children should share equally in his property, Jerusha included. This was manifestly the state of his mind when he left the home of the Crabbs. In three days thereafter, he deeded his property, not to his own sons or daughter, but to the wife and daughter of one of his sons—persons who had no direct claim upon his bounty. This was absolutely contrary to all his declarations during the latter years of his life; a thing wholly unexpected, and unnatural to contemplate from his standpoint. No statement was ever made by him to any

one, unless it was to Homer, that he intended to give all his property to Marvel's wife and daughter. These things are in themselves sufficient to cast the burden upon the beneficiaries under the deeds of establishing that the act of executing them was the free and voluntary act of the deceased, without instigation or direction of any other person. This the defendants have not done. But, beyond this, there are suspicious circumstances that lead to the inference that both Marvel and Homer, especially the latter, participated in a plan to extort the deeds from the father. Marvel brought his father from the Crabbs' home to the home of Homer against his wish, until persuaded that it would be better for him to make the move. Homer took his father for the ride against his positive wish and desire, and against the advice of his physician. Homer states that Marvel was present when he went for the drive, but he is not sure about that. When he returned from his office, where the deeds were drawn, Homer requested his wife to take Mrs. Carden to her home on an errand. She was not only taken there, but they went for a drive afterwards, which consumed from three-quarters of an hour to an hour. In the meantime the deeds were executed, with none present except the deceased, Homer, and Jonas. The deeds were first delivered by Homer to Marvel the next day. Marvel gave them back to Homer for recording. The latter says he neglected to do it. They were then handed to the bank, with the result that they were gotten into the recorder's hands about three hours after the death of the grantor.

The incidents are unsatisfactorily explained. Further than this, the reason given why he wanted Homer to transact the business puts into the mouth of the father language most unlikely to have been uttered by him, considering the condition of his mind and the circumstances leading up to and attending the transaction. When Homer, according to his testimony, suggested to his father that he preferred that some one else should write the deeds, he relates that his father said:

"Now, Homer, you are the only one that is going to cause a lawsuit in this matter, and I want you to attend to it."

A little later, when asked if he had related all that his father said about the destruction of the will, Homer replied:

"No; he said he made up his mind thoroughly that he had heard so much property talk since he had been up there that he knew there was going to be trouble if he tried to divide the property as he had expected to in life, and he thoroughly made up his mind that he would deed it all away, instead of deeding portions, as he had talked to me before. And another thing he said; "Now, Homer, you are the most likely one to cause a lawsuit, and I am going to insist on you fixing the property—put you on your honor that you are not going to deal with the property or cause any lawsuits.'"

And Homer says further:

"I told him that I was a good loser."

The attempt of the witness manifestly is to impute to his father a reason for not deeding his property as he had talked of before, which was that, if he did so, there was going to be trouble; yet he did the very thing that would not only not avoid trouble from the source Homer alludes to, but was calculated to drive Homer to a contest. Then

the reasoning proceeds that, in order to prevent him from making trouble, the deceased insisted that he (Homer) draw the deeds, for thus he would be in honor bound not to attack them. Such reasoning was entirely too complex for the old gentleman's understanding at that time; it is delusive, and is really what, in the nature of things, would not have happened. The reference to previous trouble between the children has but a semblance of testimony in the record to support it.

After a very careful consideration of the entire controversy, I am irresistibly impelled to the conclusion that, while the deceased was probably possessed of a disposing mind, yet that it was very weak, as he was physically, and that, his mind being in such weakened condition, he was imposed upon and unduly influenced to execute the deeds in question. The decree will therefore be that the deeds in controversy be annulled and set aside, and that plaintiffs recover their costs and disbursements.

As to the accounting, it appears from the answers of the defendants and the testimony that all the lands covered by the deeds were rented to Homer and Marvel on shares, the rental being one-third of the crops produced; the lessees to pay the expenses of production. There was produced on the lands claimed to have been conveyed to Jennie Anderson Watts, in 1915, wheat amounting to 2,028 sacks, which was sold for $3,361.06. There was produced on the lands claimed by Vernita, in the year 1914, wheat amounting to 2,865 sacks, which was sold for $3,863.65, and in the year 1915, 1,085 sacks, sold for $1,912.-50; making a total of receipts from crops during these years of $9,137.21. Jerusha Crabb's interest in this is $1,015.25. To this should be added one-ninth interest in the crops for 1917, respecting which no testimony has been adduced. From the sum of these amounts should be deducted one-third of the taxes on these lands, that have been paid by the defendants since the death of Thomas J. Watts. The balance would represent the amount of the rents and profits that the plaintiff Jerusha Crabb would be entitled to recover from defendants.

Let an order be entered at the foot of the decree, making a reference for ascertaining the further receipts of rents and profits, and the amount of taxes paid by defendants on the lands in question.