### ALLORE v. JEWELL.

1. Whenever there is great weakness of mind, though not amounting to absolute disqualification, arising from age, sickness, or any other cause, in a person executing a conveyance, and the consideration given for the land is grossly inadequate, a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside.
2. When a person, from infirmity and mental weakness, is likely to be easily influenced by others, transactions entered into by such person without independent advice will be set aside, if there is any unfairness in them. The principle upon which courts act in such cases, applied to a conveyance of land obtained from a woman advanced in years, of doubtful sanity, living entirely by herself, without friends to take care of her, and confined to her house by sickness.
3. The lapse of time, six years, before bringing suit to cancel a conveyance so obtained, cannot avail the defendant where he has had possession of the land, and a reasonable rent therefor is equal to the value of his improvements thereon, and there has been no loss of evidence preventing a full presentation of the case.

APPEAL from the Circuit Court of the United States for the Eastern District of Michigan.

The facts are stated in the opinion of the court.

*Mr. Alfred Russell* for the appellant.

*Mr. A. B. Maynard,* contra.

MR. JUSTICE FIELD delivered the opinion of the court.

This is a suit brought by the heir-at-law of Marie Genevieve Thibault, late of Detroit, Mich., to cancel a conveyance of land alleged to have been obtained from her a few weeks before her death, when, from her condition, she was incapable of understanding the nature and effect of the transaction.

The deceased died at Detroit on the 4th of February, 1864, intestate, leaving the complainant her sole surviving heir-at-law. For many years previous to her death, and until the execution of the conveyance to the defendant, she was seised in fee of the land in controversy, situated in that city, which she occupied as a homestead. In November, 1863, the defendant obtained from her a conveyance of this property. A copy of the conveyance is set forth in the bill. It contains covenants of seisin and warranty by the grantor, and immediately following them an agreement by the defendant to pay her $250 upon the delivery of the instrument; an annuity of $500; all her physician's bills during her life; the taxes on the property for that year, and all subsequent taxes during her life; also, that she should have the use and occupation of the house until the spring of 1864, or that he would pay the rent of such other house as she might occupy until then. The property was then worth, according to the testimony in the case, between $6,000 and $8,000. The deceased was at that time between sixty and seventy years of age, and was confined to her house by sickness, from which she never recovered. She lived alone, in a state of great degradation, and was without regular attendance in her sickness. There were no persons present with her at the execution of the conveyance, except the defendant, his agent, and his attorney. The $250 stipulated were paid, but no other payment was ever made to her; she died a few weeks afterwards.

As grounds for cancelling this conveyance, the complainant alleges that the deceased, during the last few years of her life, was afflicted with lunacy or chronic insanity, and was so infirm as to be incapable of transacting any business of importance; that her last sickness aggravated her insanity, greatly weakened her mental faculties, and still more disqualified her for business; that the defendant and his agent knew of her infirmity, and that there was no reasonable prospect of her recovery from her sickness, or of her long surviving, when the conveyance was taken; that she did not understand the nature of the instrument; and that it was obtained for an insignificant consideration, and in a clandestine manner, without her having any independent advice.

These allegations the defendant controverts, and avers that

the conveyance was taken upon a proposition of the deceased; that at the date of its execution she was in the full possession of her mental faculties, appreciated the value of the property, and was capable of contracting with reference to it, and of selling or otherwise dealing with it; that since her death he has occupied the premises, and made permanent improvements to the value of $7,000; and that the complainant never gave him notice of any claim to the property until the commencement of this suit.

The court below dismissed the bill, whereupon the complainant appealed here. The question presented for determination is, whether the deceased, at the time she executed the conveyance in question, possessed sufficient intelligence to understand fully the nature and effect of the transaction; and, if so, whether the conveyance was executed under such circumstances as that it ought to be upheld, or as would justify the interference of equity for its cancellation.

Numerous witnesses were examined in the case, and a large amount of testimony was taken. This testimony has been carefully analyzed by the defendant's counsel; and it must be admitted that the facts detailed by any one witness with reference to the condition of the deceased previous to her last illness, considered separately and apart from the statements of the others, do not show incapacity to transact business on her part, nor establish insanity, either continued or temporary. And yet, when all the facts stated by the different witnesses are taken together, one is led irresistibly by their combined effect to the conclusion, that, if the deceased was not afflicted with insanity for some years before her death, her mind wandered so near the line which divides sanity from insanity as to render any important business transaction with her of doubtful propriety, and to justify a careful scrutiny into its fairness.

Thus, some of the witnesses speak of the deceased as having low and filthy habits; of her being so imperfectly clad as at times to expose immodestly portions of her person; of her eating with her fingers, and having vermin on her body. Some of them testify to her believing in dreams, and her imagining she could see ghosts and spirits around her room, and her claiming to talk with them; to her being incoherent in her conversation,

passing suddenly and without cause from one subject to another; to her using vulgar and profane language; to her making immodest gestures; to her talking strangely, and making singular motions and gestures in her neighbors' houses and in the streets. Other witnesses testify to further peculiarities of life, manner, and conduct; but none of the peculiarities mentioned, considered singly, show a want of capacity to transact business. Instances will readily occur to every one where some of them have been exhibited by persons possessing good judgment in the management and disposition of property. But when all the peculiarities mentioned, of life, conduct, and language, are found in the same person, they create a strong impression that his mind is not entirely sound; and all transactions relating to his property will be narrowly scanned by a court of equity, whenever brought under its cognizance.

The condition of the deceased was not improved during her last sickness. The testimony of her attending physician leads to the conclusion that her mental infirmities were aggravated by it. He states that he had studied her disease, and for many years had considered her partially insane, and that in his opinion she was not competent in November, 1863, during her last sickness, to understand a document like the instrument executed. The physician also testifies that during this month he informed one Dolsen, who had inquired of the condition and health of the deceased, and had stated that efforts had been made to purchase her property, that in his opinion she could not survive her sickness, and that she was not in a condition to make any sale of the property " in a right way."

This Dolsen had at one time owned and managed a tannery adjoining the home of the deceased, which he sold to the defendant. After the sale, he carried on the business as the defendant's agent. Through him the transaction for the purchase of the property was conducted. The deceased understood English imperfectly, and Dolsen undertook to explain to her, in French, the contents of the paper she executed. Some attempt is made to show that he acted as her agent; but this is evidently an afterthought. He was in the employment of the defendant, had charge of his business, and had often talked with him about securing the property; and in his interest he

acted throughout. If the deceased was not in a condition to dispose of the property, she was not in a condition to appoint an agent for that purpose.

The defendant himself states that he had seen the deceased for years, and knew that she was eccentric, queer, and penurious. It is hardly credible that, during those years, carrying on business within a few yards of her house, he had not heard that her mind was unsettled; or, at least, had not inferred that such was the fact, from what he saw of her conduct. Be that as it may, Dolsen's knowledge was his knowledge; and, when he covenanted to pay the annuity, some inquiry must have been had as to the probable duration of the payments. Such covenants are not often made without inquiries of that nature; and to Dolsen he must have looked for information, for he states that he conversed with no one else about the purchase. With him and with his attorney he went to the house of the deceased, and there witnessed the miserable condition in which she lived, and he states that he wondered how anybody could live in such a place, and that he told Dolsen to get her a bed and some clothing. Dolsen had previously informed him that she would not sell the property; yet he took a conveyance from her at a consideration which, under the circumstances, with a certainty almost of her speedy decease, was an insignificant one compared with the value of the property.

In view of the circumstances stated, we are not satisfied that the deceased was, at the time she executed the conveyance, capable of comprehending fully the nature and effect of the transaction. She was in a state of physical prostration; and from that cause, and her previous infirmities, aggravated by her sickness, her intellect was greatly enfeebled; and, if not disqualified, she was unfitted to attend to business of such importance as the disposition of her entire property, and the securing of an annuity for life. Certain it is, that, in negotiating for the disposition of the property, she stood, in her sickness and infirmities, on no terms of equality with the defendant, who, with his attorney and agent, met her alone in her hovel to obtain the conveyance.

It is not necessary, in order to secure the aid of equity, to prove that the deceased was at the time insane, or in such a

state of mental imbecility as to render her entirely incapable of executing a valid deed. It is sufficient to show that, from her sickness and infirmities, she was at the time in a condition of great mental weakness, and that there was gross inadequacy of consideration for the conveyance. From these circumstances, imposition or undue influence will be inferred. In the case of *Harding* v. *Wheaton*, reported in the 2d of Mason, a conveyance executed by one to his son-in-law, for a nominal consideration, and upon a verbal arrangement that it should be considered as a trust for the maintenance of the grantor, and after his death for the benefit of his heirs, was, after his death, set aside, except as security for actual advances and charges, upon application of his heirs, on the ground that it was obtained from him when his-mind was enfeebled by age and other causes. " Extreme weakness," said Mr. Justice Story, in deciding the case, " will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity; and though a contract, in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet if it should appear to be of such a nature as that such a person could not be capable of measuring its extent or importance, its reasonableness or its value, fully and fairly, it cannot be that the law is so much at variance with common sense as to uphold it." The case subsequently came before this court; and, in deciding it, Mr. Chief Justice Marshall, speaking of this, and, it would seem, of other deeds executed by the deceased, said : " If these deeds were obtained by the exercise of undue influence over a man whose mind had ceased to be the safe guide of his actions, it is against conscience for him who has obtained them to derive any advantage from them. It is the peculiar province of a court of conscience to set them aside. That a court of equity will interpose in such a case is among its best-settled principles. *Harding* v. *Handy*, 11 Wheat. 125.

The same doctrine is announced in adjudged cases, almost without number; and it may be stated as settled law, that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate,

a court of equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside. And the present case comes directly within this principle.

In the recent case of *Kempson* v. *Ashbee*, 10 Ch. Cas. 15, decided in the Court of Appeal in Chancery in England, two bonds executed by a young woman, living at the time with her mother and step-father, — one, at the age of twenty-one, as surety for her step-father's debt, and the other, at the age of twenty-nine, to secure the amount of a judgment recovered on the first bond, — were set aside as against her, on the ground that she had acted in the transaction without independent advice ; one of the justices observing that the court had endeavored to prevent persons subject to influence from being induced to enter into transactions without advice of that kind. The principle upon which the court acts in such cases, of protecting the weak and dependent, may always be invoked on behalf of persons in the situation of the deceased spinster in this case, of doubtful sanity, living entirely by herself, without friends to take care of her, and confined to her house by sickness. As well on this ground as on the ground of weakness of mind and gross inadequacy of consideration, we think the case a proper one for the interference of equity, and that a cancellation of the deed should be decreed.

The objection of the lapse of time — six years — before bringing the suit cannot avail the defendant. If during this time, from the death of witnesses or other causes, a full presentation of the facts of the case had become impossible, there might be force in the objection. But as there has been no change in this respect to the injury of the defendant, it does not lie in his mouth, after having, in the manner stated, obtained the property of the deceased, to complain that her heir did not sooner bring suit against him to compel its surrender. There is no statutory bar in the case. The improvements made have not cost more than the amount which a reasonable rent of the property would have produced, and the complainant, as we understand, does not object to allow the defendant credit for them. And as to the small amount paid on the execution of the conveyance, it is sufficient to observe, that the complainant received from the

administrator of the deceased's estate only $113.42; and there is no evidence that he ever knew that this sum constituted any portion of the money obtained from the defendant. A decree must, therefore, be entered for a cancellation of the deed of the deceased and a surrender of the property to the complainant, but without any accounting for back rents, the improvements being taken as an equivalent for them.

*Decree reversed, and cause remanded with directions to enter a decree as thus stated.*

Mr. Justice Strong, with whom concurred Mr. Chief Justice Waite and Mr. Justice Bradley, dissenting.

I cannot concur in the judgment given in this case. Were there no other reason for my dissent, it would be enough that the complainant has been guilty of inexcusable laches. He knew every thing of which he now complains, in February, 1864, when the grantor of the defendant died, and when his rights as her heir vested; and yet he waited until six years and nine months thereafter before he brought this suit, and before he made any complaint of the sale she had made. Meanwhile, he accepted the money the defendant had paid on account of the purchase, and he stood silently by, asserting no claim, while the defendant was making valuable improvements upon the lot, at a cost of $6,000 or $7,000, a sum about equal to the value of the property at the time of the purchase. To permit him now to assert that the sale was invalid, because the vendor was of weak mind, is to allow him to reap a profit from his own unconscionable silence and delay. I cannot think a court of equity should lend itself to such a wrong.