[L. A. No. 17041. In Bank.—April 21, 1941.]

JEWEL W. BURNS, as Guardian, etc., Respondent, v. JOHN HENRY CAMPBELL, Appellant.

Bordwell, Mathews & Wadsworth and John H. Mathews for Appellant.

Ticknor & Maxwell and Roland Maxwell for Respondent.

EDMONDS, J.—The appellant complains that findings of fact upon which a judgment was rendered against him in an action to cancel a deed are not supported by the evidence.

He asserts that the proof falls far short of the law's requirements in such a case.

About two years after Ollie J. Burns executed the deed in controversy, she was declared incompetent and her guardian commenced this action. Later Mrs. Burns died and the administrator of her estate was substituted as plaintiff.

The complaint charges that although Mrs. Burns at the time of the execution of the deed was not entirely without understanding, she was in an extreme condition of mental and physical weakness and therefore did not understand the nature and effect of the deed; that she received no consideration for it; that she signed it wholly under the influence of the appellant, who had succeeded in gaining her trust and confidence by making her believe that he was to be considered by her as her son who had been drowned in the St. Francis Dam flood disaster; and that at the time of the signing of the deed she was not following the dictates of her own will but was acting wholly under the influence of the appellant.

The facts concerning the relations of Mrs. Burns and the appellant, as related by him when called by the respondent as a witness and in testimony upon his defense, show that they met about four years before the deed was executed. Briefly summarized, these facts are as follows:

For more than twenty-five years George Wood had known Ollie J. Burns, the grantor, and her husband. Mr. Wood had lived near their ranch and was "out there on Sunday and so on for years and years." In 1931, Mr. Wood was in the east, and he and the appellant drove back to California in the latter's automobile. They went to the Burns ranch and, at Mr. Burns' request, stayed with him. Mrs. Burns was not living there when they arrived but Mr. Campbell met her some time later. In the following year, Mrs. Burns came to the ranch to live.

Mr. Wood's visit continued for a month; the appellant remained almost a year, when he left to go to work as an automobile mechanic in a near-by town. A short time later, Mrs. Burns, accompanied by Mrs. Johnson, came to see him at his place of employment. "She just asked me if I would like to live at the ranch and she said if I did, she wanted me to come back there and live and take her wherever she wanted to go and if I did, she would leave the ranch to me

upon her death. . . . I told her I would come down in about a month, I had another month's work. . . . ''

It was the fall of 1932 when the appellant returned to the ranch. Apparently it is desert land which has never been financially profitable. In describing his life there, the appellant testified that he did odd jobs around the ranch, plowed the land, repaired the well and the roof of the house, and drove Mrs. Burns wherever she wanted to go, including trips to Lancaster, Bakersfield and Long Beach. When he took her "to town" he used his own automobile and paid for the gasoline. He called her "Mother", but explained that many other people addressed her in that way and "a lot of other people, old ladies up in that country" also were called "mother". She was known as "Ma Burns". He and Mr. and Mrs. Burns lived in the same house, each having a separate room.

The appellant is an automobile mechanic and did repairing for the neighbors and others. He loaned Mrs. Burns some small amounts of money which were repaid, but Mrs. Burns provided his living expenses. She professed a great affection for him, he testified, and he carried out her wants.

Although the respondent claims that Mrs. Burns had been in poor health for some time prior to the execution of the deed, the respondent's charges concerning her physical and mental condition relate largely to the period following November, 1934, when she suffered a stroke. This occurred while Mrs. Burns was at the ranch. According to the appellant, she stayed in bed a few days, but after that, aside from the fact that she was a little slower in walking and one side of her face was affected, "she was practically the same". He took her to the home of Mr. and Mrs. Naley in Los Angeles, because she needed attention.

Early in 1935, the appellant learned that Mrs. Burns had requested a friend to make arrangements for her to see a lawyer. An appointment was made, and on February 11, 1935, the appellant took her to his office. Mr. and Mrs. Naley accompanied them. This lawyer had never met her before. According to his testimony, she explained her business to him by saying that she had always wanted to deed her ranch to Mr. Campbell; he had lived there and helped her and she had no relatives except Mr. Burns with whom she was not living at that time. She also said, the lawyer stated,

that she wanted to deed her other property to Mr. and Mrs. Naley, with whom she had lived off and on for fifteen or twenty years; that Mr. and Mrs. Naley had taken care of her in town and Mr. Campbell had looked after her at the ranch.

In other testimony, the attorney stated that Mrs. Burns requested that the deeds include certain specific provisions, such as one reserving to her a life estate in the ranch. He related that the two deeds were prepared by him in accordance with Mrs. Burns' instructions and she executed them. Mrs. Burns talked rationally, he said, stating very definitely what she wanted, "and there is no question in my mind as to her mental condition"; she was competent to execute the deed. So far as he could recall, he added in response to a question, Mr. and Mrs. Naley and Mr. Campbell took no part in the conversation.

The deeds were executed three months after the stroke occurred. A witness, testifying as an intimate acquaintance, stated that during this time he saw Mrs. Burns approximately twice a month; that it was difficult for her to carry on a conversation; that she could hardly take care of herself and had to have an attendant bathe her daily. Her habits after the stroke were entirely different from those before, he said; "she was lively and could carry on a conversation, but after she had the stroke she lost everything". Based upon these observations of her, he formed the opinion that she was of unsound mind at that time.

Another witness had been acquainted with Mrs. Burns since 1915, and saw her on an average of once a month until about eight or nine months before the stroke in November, 1934. She did not see Mrs. Burns again until September, 1935, which was about seven months after the deed was executed. In December of that year Mrs. Burns came to her home and lived there until April, 1936.

The testimony of this witness was to the effect that in September, 1935, Mrs. Burns was feeble and careless about her person; that "she would have fantastic ideas for instance, she told me there was no cemetery in Lancaster where her son was buried." In speaking of the reason that Mrs. Burns had come to stay with her she said that Mrs. Burns had told her she was having extensive repairs made on her house; "she wrote me a letter and asked us to come and get

her, which we did. . . . '' She also expressed the opinion that Mrs. Burns was not of sound mind, explaining, ''you couldn't trust her around the house, she would go out in the kitchen and turn on all the gas jets; she would walk away and leave them and she would leave the water running in the wash bowl.'' A third witness, an acquaintance of Mrs. Burns since 1909, testified that after her stroke she was extremely vulgar and careless with herself; also, that she couldn't carry on a conversation properly as her face was twisted. This witness stated that, in her opinion, Mrs. Burns was of unsound mind after the stroke in 1934 and in the month of February, 1935.

As against this testimony, the appellant, in answer to the question as to whether there were times between the first and a second stroke which occurred when she did not appear to be rational, answered that everyone has ''off days'', but that he never saw her when she couldn't carry on a connected conversation. From his observation ''she was 100 per cent mentally from her first stroke until she had the second one.'' She was profane, but not more so than before. He stated that Mrs. Burns returned to the ranch in the summer of 1935 and stayed two or three months, and in the following year she went there earlier and remained for a longer period of time. On these occasions there was no one attending her and she took care of herself.

A physician who treated Mrs. Burns for a year commencing just before the deed was executed expressed the opinion that ''her mental condition was all right'' although ''some things were a little hard for her to remember.'' He examined her weekly, he testified, and there was no change in her mental condition. One of these examinations was made on the day she signed the deed. The doctor's case history included the statements ''patient says she cannot remember some things'' and ''her head bothers her somewhat and cannot think clearly'', but he stated that a paralytic stroke does not necessarily result in an disturbance of the mental functions.

Upon this evidence the trial court made findings in literal accordance with the allegations of the complaint. These findings, the appellant declares, are entirely unsupported by the evidence. The evidence clearly shows, he asserts, that after he had left the ranch to work in Mojave, Mrs. Burns

induced him to return and assist her in taking care of it. She agreed that if he did so she would give it to him; the conveyance of the property to him was wholly her idea; and the deed was executed without influence on his part and while she was mentally sound.

The respondent relies upon the principle that where it is shown that one party to a contract acted while he was weak in mind arising from illness or other cause, and there was either inadequacy of consideration or circumstances of undue influence and advantage, the contract will be set aside. (*Hays* v. *Gloster*, 88 Cal. 560 [26 Pac. 367]; *Moore* v. *Moore*, 56 Cal. 89; *Shaffer* v. *Security T. & S. Bank*, 4 Cal. App. (2d) 707 [41 Pac. (2d) 948]; *Bryson* v. *Gross*, 83 Cal. App. 638 [257 Pac. 137].) It was therefore not necessary for him to prove a complete lack of understanding upon the part of Mrs. Burns, and there is evidence to support the finding of the trial court that at the time Mrs. Burns executed the deed, "her reason was not entirely dethroned, but at that time she was in an extreme condition of mental and physical weakness." ▪ However, the court also found that Mrs. Burns "received no consideration for the execution of said deed". This is entirely contrary to the facts shown in evidence, and even if this finding be very liberally construed to mean that there was inadequacy of consideration, there is no evidence to support it.

On the contrary, the appellant testified that in 1932, she asked him to return to the ranch and agreed that if he would do so, look after it and drive her wherever she wished to go, she would deed it to him. This testimony was substantiated by the neighbor who accompanied Mrs. Burns to Mojave and was present when the matter was discussed. There is neither allegation nor proof that Mrs. Burns was in a weakened mental condition at the time of this conversation, and it appears that the appellant carried out his part of the agreement to her satisfaction. Certainly his services and companionship for more than two years were of some value, and the finding that Mrs. Burns "received no consideration" for her deed is contrary to the undisputed facts. ▪ Moreover, so far as the record shows, there is nothing upon which a court might base a conclusion that this consideration was inadequate, if such a determination might properly be made, because there is no evidence concerning the value of the property con-

veyed. However, tax bills offered in evidence for another purpose show that in 1937 and preceding years, it was assessed on the basis of a land valuation of $110 and an additional $80 for improvements.

 Concerning undue influence, there is no evidence whatever that the appellant exercised any control over Mrs. Burns or that her actions were the result of his direction. In addition to the testimony concerning the conversation between Mrs. Burns and appellant when she asked him to return to the ranch, two other witnesses related statements made by her at later times on this subject. One of them said that in 1932 Mrs. Burns told him she was going to deed the ranch to the appellant because he had done more for her than anyone else, with the exception of her sons. Another related that she told him she had executed the deed to him. The testimony of the attorney who prepared the deed is clear and unequivocal that Mrs. Burns expressed the desire to convey her ranch to the appellant and that she stated her reason for so doing. There is no evidence that the appellant ever requested her to execute a deed to him or that he influenced her in that or any other matter.

The respondent argues that there was a confidential relationship between Mrs. Burns and Mr. Campbell, and therefore the law will presume that he exercised it unduly to his own advantage. (*Odell* v. *Moss*, 130 Cal. 352 [62 Pac. 555]; *Bradley Co.* v. *Bradley*, 37 Cal. App. 263 [173 Pac. 1011].) He admits that the evidence does not show the existence of a relationship such as attorney and client, or physician and patient, but he declares that it meets the requirements stated in *Scovill* v. *Guy*, 205 Cal. 386 [270 Pac. 934]. In that case the court held that "it was sufficient for the plaintiff to show the existence of such friendly relations during a period of several years between himself and the defendant as would entitle the plaintiff to place confidence in the integrity and honesty of the defendant and in the truth of whatever representations the latter was making to him with regard to the transaction and to the particular business wherein the defendant by his correspondence was proposing that the plaintiff and himself should jointly engage." But the record now before the court includes no evidence that Mr. Campbell made any false representations to Mrs. Burns with reference to the transaction in controversy, or concerning

any other business matter. On the contrary, according to the uncontradicted testimony, the first mention of a deed to the ranch came from Mrs. Burns; she made the arrangements to go to see a lawyer; these arrangements were made through her friend without the appellant's knowledge; he accompanied her to the lawyer's office but she stated her wishes and provided the description of the property to be conveyed.

Under these circumstances, the respondent has not complied with the requirements of the rule upon which he relies.

The judgment is reversed.

Shenk, J., Traynor, J., Carter, J., Curtis, J., and Gibson, C. J., concurred.

Respondent's petition for a rehearing was denied May 19, 1941.