69 Cal.App.2d 704 (1945)
Estate of MARGARET T. BRAST, Deceased. ANNIE MUNNELLY, Respondent,
v.
KATHERINE G. HANLON, Individually and as Administratrix With the Will Annexed, etc., Appellant.
Civ. No. 12813. 
California Court of Appeals. First Dist., Div. Two. 
June 26, 1945.
 Joseph J. McShane, A. E. Levinson and Frank J. Fontes for Appellant.
 John B. Ehlen for Respondent.
 GOODELL, J.
 This is an appeal from a decree cancelling a deed of gift made by the decedent to the appellant on December 2, 1941.
 Margaret T. Brast, a widow, died on December 19, 1941. On June 9, 1941, she had made a will wherein she named the Bank of America as executor, but the bank renounced its right to act and the appellant, Katherine G. Hanlon, a sister of the testatrix, was appointed administratrix with the will annexed. The testatrix had owned a piece of real property, improved with flats, on Fell Street between Scott and Divisadero Streets in San Francisco, and by the will this property was devised to the respondent, Annie Munnelly, a niece of the testatrix, residing in Ireland. The will bequeathed to the respondent the furniture and furnishings in the flat occupied by the testatrix, personal effects and clothing, and named her as the residuary legatee and devisee. Two cash legacies of $300 each, and three of $200 each, were left to friends. To a niece the testatrix left $1.00. To each of her four sisters, including appellant, the testatrix left $1.00 with the comment that they were already well provided for.
 On December 2, 1941, seventeen days before her death, Margaret Brast made a deed of gift to the appellant of the Fell Street property which by the will had been devised to the respondent.
 Some sixteen months after letters had been issued a petition *706 on respondent's behalf was filed in the probate proceeding alleging that no inventory had been filed; that the deed had been made when Mrs. Brast was extremely weak and infirm, totally incapable, because of her mental and physical weakness and infirmity, of executing a deed or of comprehending its significance and under undue influence, and that the appellant claimed under the deed adversely to the estate. For these reasons it prayed for the suspension or revocation of the appellant's letters and for the appointment of a special administrator to sue on behalf of the estate for a cancellation of the deed. Within a month thereafter an inventory was filed listing as the estate's only assets $1,019.09 in bank and an account in a savings and loan company appraised at $876.76. Thereupon the respondent filed a second petition repeating the allegations respecting the deed and the circumstances under which it was made, showing further that the inventory scheduled only the money and the savings and loan account as assets of the estate, and praying that the administratrix be compelled to disclose all transactions between herself and the decedent and all property obtained by her from the decedent. An answer was filed and a hearing on the issues resulted in the decree cancelling the deed. The appellant was neither suspended nor removed as administratrix.
 Margaret Brast's death, at the age of 72 years, was caused by a cerebral hemorrhage suffered several months theretofore, which left her completely paralyzed on her left side. Her attending physician was first consulted by her at his office on August 15, 1941, before which time, he testified, she had suffered a slight stroke according to symptoms she then had, including numbness. Her memory then was poor and she seemed somewhat confused. She had marked arteriosclerosis and high blood pressure. At that first visit she gave her medical history. After that "she evidently had another stroke" and September 20 the doctor ordered her to the hospital where she remained until October 27 when, on the doctor's recommendation, she was returned to her home, not because of her improvement, but because she was troublesome and there were conflicts between the appellant and the hospital people respecting the patient's care. After her return home and until her death seven weeks later, Mrs. Brast was cared for by a practical nurse who stayed at the home day and night. While she was in the hospital the doctor visited her practically every *707 day and after her return to her flat on Fell Street he called on her on October 30, November 6 and 30 and December 7, 13, 17 and 19. The doctor testified that almost every time he saw the patient, whether in the hospital or in her home, she "was very irrational, her mental condition was bad" and that the only time when her mind was fairly clear was the first time he saw her, on August 15, 1941. In the hospital, the doctor said, she was very hard to take care of. "Sometimes I could talk to her and she would answer very well, but her mind was bad." He did not talk any business with her. He was asked, "Q. In your opinion, would she know fully what she was doing in executing a deed of gift to her property?" to which he answered, "I could not answer that. She might have had some lucid intervals during the last part. I didn't see her every day; I saw her November 30th, and I didn't see her again until December 7th." The hospital charts showed that while Mrs. Brast was there she was very irrational and they were unable to get her history from her. The doctor admitted that in the hospital "she may have had some lucid intervals, but not very often." In his opinion "she was not competent to decide matters for herself." On the first visit Mrs. Brast, according to the doctor, told him that her memory was very poor. After that he never tested it "because she wasn't rational enough, and there was no necessity to do that." The doctor testified that he did not remember talking to the decedent about her will or of saying to Mrs. Hanlon or anyone else that Mrs. Brast was mentally capable of making a will. When asked flatly if in his opinion she was so capable he said "she was not."
 The doctor was called in rebuttal and was asked by the judge: "Q. If you were present in court and heard Mr. McShane testify, and also the notary who went there, Mr. Allen, they testified they had conversations with her and that she was perfectly normal, her mind was clear and she indulged in conversation on different topics, and that she knew what she was doing when she signed this deed and requested the notary to appear there, and wanted to give her house to her sister, would your testimony be the same?" To this he answered frankly: "A. No, it would not, but I would take the opinion of all these people that she must have had a clear space during that time. When you attend people who have cerebral hemorrhage *708 their mind is frequently normal. Then there are times when it is perfectly irrational. Q. Can they clear up at times? A. They could clear up at times; you must remember the great French chemist, Louis Pasteur, had a cerebral hemorrhage when he was 47 and for six months could not do anything, yet most of his great work was done after that. A person can be paralyzed on one side and still have his mind clear, paralyzed I mean from a cerebral hemorrhage. But this patient of mine, this lady, when I attended her, she was not clear, she was awful when she was in the hospital, and even at home she tossed and turned, and while she may have answered some questions to me clear enough, as she certainly did when I signed the letter to the bank when I asked her, 'Do you want your sister to open the safe deposit box?' And I remember she said, 'Yes'. Then I said, Put your mark here', and she did so, and I signed it." The foregoing is the only medical testimony in the case.
 The evidence on the side of the appellant is substantially as follows: A woman friend who had known the decedent for 44 years came down from Sacramento about once a week while she was in the hospital, and visited her for a half hour or so. She visited her twice at her home, the second time 3 or 4 days before decedent died. She testified that before decedent had been taken sick decedent had told the witness that she had made an awful mistake, and that she should have left everything to Kate, who was good to her, and that she was going to change everything and leave everything to Kate. She repeated this later, including at the visit 3 or 4 days before her death. She testified that Mrs. Brast was very weak, and "spoke very low." When asked whether she had had an opportunity to form an opinion as to decedent's mental condition at the hospital she replied, "It was all right; she recognized me all right, and talked to me all right" and her conversation was rational. On the last visit, the decedent commented on the furs the witness was wearing, and told appellant to show the witness her leg, which was drawn up to her chest. She only talked to her a few minutes, for the nurse told her not to stay too long. She was not there on the day the deed was made.
 Another woman friend had known the decedent ever since she (the witness) was 11 or 12 years old. She visited her in *709 the hospital once or twice a week but had no conversation there respecting the property. About a week before her death, however, the decedent told the witness in the presence of the nurse, the appellant and another witness that she wanted Kate to have everything, that Kate had been very good to her. This witness was not questioned as to the decedent's mental condition.
 A third woman friend, who had known the decedent for 30 years and had lived in the home with her for about 8 years, had visited her in the hospital every day. On the day when the deed was made, after its execution, she went in to see Mrs. Brast, said "hello," asked her how she felt to which she answered "fine." She was not questioned any further as to the decedent's mental condition at that time. Mrs. Brast had told her on several occasions that she was going to see that appellant had the house because she had been so good to her. As to Mrs. Brast's mental capacity she testified, "She was all right as far as I could see," perfectly normal; Mrs. Brast would ask her if everything was O. K. at the flat. She testified that the decedent had difficulty in talking at times, but not very often, and that after she came home from the hospital she was fine.
 The nurse who took care of the decedent in the home, testified that shortly after she went there decedent told her appellant "had been very kind to her, and she had never willed her anything, and she was going to leave her those flats." When asked for the conversation at the time the deed was made she did not remember. Asked as to the decedent's mental capacity she answered "she was quite normal." The question "At what time, if at all, was Mrs. Brast of unsound mind while she was in your care?" was answered "Well, I couldn't say." When asked "Was she at any time?" she replied "She was a very lovely woman to take care of, sweet and nice."
 A young woman was sent to the hospital on October 17, and to the home on November 12, to see that withdrawal slips for current expenses were properly signed and witnessed. These were executed by mark. This witness testified that the decedent "just acted like she was of sound mind, I mean like an ordinary person."
 The appellant testified that she and the decedent had complete trust and confidence in each other; that immediately *710 after her sister came from the hospital she told appellant over and over that "I wasn't in the will and she wanted me to get the flat because I had been kind to her"; that the decedent, not the appellant, had brought up the subject. The appellant was at the hospital all day, every day, and when her sister came home she spent the entire day, every day, with her. The appellant testified that when the deed was executed the decedent said appellant had been a wonderful sister and she wanted her to have the property. At that time the decedent "had no glasses on and she couldn't see, anyhow, her eyes were bad and she was very badly paralyzed, her left leg was drawn up to her chest and her left arm was cross this way on her chest (indicating) ... and her mind and speech__________ her speech was not so good, but she could talk." The appellant said "her mind was always clear to me" but she admitted that "She was a pretty sick woman; she didn't talk much and didn't like company. ... As far as I know, her mind always appeared to me all right." "She was a very sick woman at the hospital and she was much better at home" said the appellant.
 The circumstances attending the execution of the deed are substantially as follows: The will had been drawn by an attorney to whom the testatrix had been sent by the bank. The appellant called upon this attorney at his office for the purpose of getting the will. He said this was on December 1. He did not have the will and told the appellant that the bank presumably had it. He had his office copy but refused to let her have it, whereupon, according to the attorney, appellant "became very mad" and abusive, but "cooled down a bit." According to his testimony it was agreed that at 11 o'clock the following morning (December 2) he would go to the decedent's home for the purpose of making whatever changes she wanted to make, but on that next morning before the appointed hour appellant telephoned him "Never mind coming out, my sister is pretty low and the priest is there right now giving her the last rites of the Church and it will be impossible for anyone to see her"; she was "pretty far gone" or "too far gone." He testified that the next day after that he telephoned appellant to ask how her sister was and was told that she was about the same. He then suggested that he and a representative of the bank go out, to which appellant replied that it *711 would be unnecessary because "I got another attorney yesterday and she made a deed of the Fell street property to me" by her mark. The only time this witness ever saw the decedent was when he drew her will. The appellant denied that she had cancelled the appointment. She said she told this attorney that she (appellant) had her own attorney. She claimed she never telephoned the first-mentioned attorney until after the decedent's death. It is uncontradicted that on December 2 another attorney, one who had theretofore acted in legal matters for the appellant, called at the home of decedent with a deed which he had prepared in his office. He had been sent for by the appellant (who testified that she acted at the decedent's request) and called on the decedent a day or two before and obtained the description and other details. He had never met the decedent before; she had never before had an attorney of her own (except in the drafting of the will). On December 2, he was accompanied by a notary public from his office, and the deed was executed in the forenoon of that day.
 The instrument is in the form of a deed of gift, reciting love and affection as its consideration, and grants and conveys all the right, title and interest of the decedent in the Fell Street property to the appellant. It was executed by mark. There were present when it was executed the notary and the nurse, both of whom signed as witnesses. The evidence shows that before making her mark the decedent attempted to sign her name. The face of the deed shows, about an inch above the signing line, a poor attempt at a signature, the "M" being fairly legible, but the remainder being a mere indecipherable scrawl. The doctor testified that in his opinion Mrs. Brast was physically capable of writing her signature on this deed (she was right-handed, could normally write a good hand, and her paralysis was on her left side) but he attributed her inability to sign her name to her impaired mental powers, the doctor observing "It would indicate to me she was in the same mentally unbalanced irrational condition as she was when I treated her." Both the attorney who drew the deed and the notary in attendance gave testimony favorable to the appellant, as has already appeared. Before leaving this phase of the subject it should be noted that the appellant denied having said over the telephone on December 2 that her sister was then receiving the last rites. She testified that she did *712 not receive the last rites on that day but had received them in the hospital. A letter was introduced in evidence written by the appellant to the respondent on December 2 reading as follows:
 "Dear Annie: Just a few lines to let you know that Aunt Margaret has been very sick for about four months and is still very sick; she had three strokes and her left side is paralyzed; she is bedridden and we have a nurse for her. She was in the hospital two months, but it was a little expensive and it is worse home as laundry and everything runs into money. She had the priest this morning and got the last Sacrament, but she may live a long time as she is very strong, so we never know what is going to happen. Well, Aunt Mary is also given up for dead, is in a serious condition, received the last Sacrament also. Well, I guess their time has come, maybe. Well, now, my dear, I don't know what else to write as I am as busy as a bee, and so much sickness sure tires one out, so will close with love to you all from your loving Aunt Katherine Hanlon."
 The court found that at the time when the deed was executed the decedent was 72 years of age, "extremely weak and infirm, and totally incapable, because of her mental and physical weakness and infirmity, of executing a valid deed ... or of understanding or comprehending the meaning and significance of the execution of a deed ..." and that there was no consideration for the deed except love and affection. The court went further and found inter alia that a confidential relationship existed between the sisters and that appellant had complete control of all the decedent's affairs; that appellant arranged to have her own lawyer attend to this transaction; that the decedent had no independent advice, and that the execution of the deed was produced by the suggestions and activity of the appellant.
 [1a] The appellant contends that on this record the transaction should be upheld, and that the evidence is insufficient to support the findings and decree which upset it. More specifically she contends that the evidence is uncontradicted that at the time of the execution of the deed the decedent's mind was normal and clear. The foundation for this claim is the testimony of four witnesses, namely, the appellant, the nurse, the lawyer who drew the deed and the notary, combined with *713 the fact that when the doctor was asked by the court whether, in view of their testimony he adhered to his former opinion, he answered frankly that the decedent "must have had a clear space during that time." (He had not seen the patient between November 30 and December 7.) The appellant in this contention relies on the rule that "the actual mental condition of the testatrix at the time of the execution of the will is the question to be determined," citing Estate of Perkins, 195 Cal. 699 [235 P. 45] and Estate of Peterkin, 23 Cal.App. 2d 597, 604 [73 P.2d 897], but such cases as these and Estate of Nolan, 25 Cal.App.2d 738 [78 P.2d 456], and Estate of Arnold, 16 Cal.2d 573 [107 P.2d 25] cited and relied on by appellant are not in point for the reason that they deal with testamentary capacity while this case is concerned with the competency of the grantor in the execution of a deed. The two tests differ. See Estate of Sexton, 199 Cal. 759, 768 [251 P. 778] and Estate of Arnold, supra, where this difference is pointed out.
 The respondent on the other hand relies on the doctrine of Allore v. Jewell, 94 U.S. 506 [24 L.Ed. 260], which was adopted as the law of this state in the case of Moore v. Moore, 56 Cal. 89. Presumably the trial court followed that rule for the record shows that the respondent drew to the court's attention the case of Shaffer v. Security T. & S. Bank, 4 Cal.App.2d 707, 712 [41 P.2d 948], where the rule was applied and the older authorities are cited.
 In the Moore case the court quotes from Allore v. Jewell as follows: "'It is not necessary, in order to secure the aid of equity, to prove that the deceased was at the time insane, or in such a state of mental imbecility as to render her entirely incapable of executing a valid deed. It is sufficient to show that, from her sickness and infirmities, she was at the time in a condition of great mental weakness, and that there was gross inadequacy of consideration for the conveyance. From these circumstances, imposition or undue influence will be inferred.'" In Richards v. Donner, 72 Cal. 207, 210 [13 P. 584], which has many points of similarity to the case at bar, this is said: "The learned judge of the court below evidently based his conclusion upon the doctrine enunciated and applied by this court in the case of Moore v. Moore, 56 Cal. 89. The court there refers to the case of Allore v. Jewell, 94 U.S. 506 [24 L.Ed. 260], and quotes approvingly from the opinion of Mr. *714 Justice Field. That was an action brought to set aside a conveyance made by a person advanced in years, of great weakness of mind, though not amounting to absolute disqualification, for an inadequate consideration, and without independent advice. There was no showing or claim of undue influence on the part of the grantee. The court there said: 'It may be stated as settled law that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court equity will, upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside.' (See, also, Haydock v. Haydock [34 N.J.Eq. 570], 38 Am.Rep. 385)." In Richards v. Donner as in this case, the deed of gift under attack had been made by a person who had suffered a paralytic stroke; the court had found that the deed had been made by the grantor "while in a condition of great mental weakness ... without understanding the nature, effect, or consequences of his act." It was claimed that the plaintiff was not entitled to relief because he had "failed to show undue influence on the part of the donee, and because the mistake of the donor, as to the character of this act, was the offspring of his own weakness, with which the donee had nothing to do." With respect to this claim the court said: "It seems that the current of authority, English and American, is unvarying in its adherence to the same beneficent remedies ... and although judges have differed in the reasons given for the application of the rule, and the phases under which it has been applied are numerous and diverse, yet the conclusion reached is quite uniformly the same, whether the donee act in good or bad faith." And again "The right of plaintiff to recover did not depend on the question of the donor's sanity or soundness, nor upon the question of the donee's good faith or undue influence." (Emphasis ours.) (See, also, Wilson v. Moriarty, 77 Cal. 596, 600 [20 P. 134]; Klose v. Hillenbrand, 88 Cal. 473 [26 P. 352]; Hays v. Gloster, 88 Cal. 560, 566 [26 P. 367]; Swan v. Talbot, 152 Cal. 142, 146 [94 P. 238, 17 L.R.A.N.S. 1066]; Marron v. Marron, 19 Cal.App. 326, 332 [125 P.2d 914]; Bryson v. Gross, 83 Cal.App. 638, 644 [257 P. 137]; and Shaffer v. Security T. & S. Bank, 4 Cal.App.2d 707, 712, supra.) In Burns v. Campbell, 17 Cal. 2d 768, 773 [112 P.2d 237], after stating the rule the court *715 says: "It was therefore not necessary for him [respondent] to prove a complete lack of understanding upon the part of Mrs. Burns, and there is evidence to support the finding of the trial court that at the time Mrs. Burns executed the deed, 'her reason was not entirely dethroned, but at that time she was in an extreme condition of mental and physical weakness'."
 [2] The findings bring this case squarely within the rule just discussed, and they are amply supported by the evidence. There is found in this case a conjunction of at least two of the elements mentioned in the authorities (see 4 Cal.Jur. 18, p. 782), namely, extreme mental weakness and "plain inadequacy of consideration" (Hays v. Gloster, 88 Cal. 560, 566 [26 P. 367]), and under the authorities the only function of an appellate court is to determine whether the record supports the finding of such elements. In the recent case of George v. Soares, 54 Cal.App.2d 29, 31 [128 P.2d 377], this court had occasion to consider the rule of Moore v. Moore, and we there said it "is not a rule that in all cases where some of these elements are present the trial court must set aside the conveyance. The rule is that when the trial court, in the exercise of its judicial discretion, has found that the circumstances warrant such equitable relief the decree will not be disturbed on appeal."
 [3] It is claimed that error was committed in allowing the question "In your opinion, based on what you observed during the time you acted as Mrs. Brast's physician, was she in a condition at any time when you observed her to transact ordinary business? A. At no time, except perhaps the first visit on August 15th, when she seemed to be__________ her mind seemed to be fairly clear, because I got her history then and talked to her quite a bit. At no time at the hospital visits, or at the visits to her home, in my opinion, was she competent to transact business." Estate of DeSoberanes, 182 Cal. 525 [189 P. 103], is cited, where a somewhat similar question was asked and the court held it called for the conclusion of the witness and that the objection thereto was properly sustained. Langenbeck v. Louis, 140 Cal. 406, 411 [73 P. 1086], holds the same way, as does Coyne v. Pacific Mut. Life Ins. Co., 8 Cal.App.2d 104, 111 [47 P.2d 1079]. There is, however, authority that such a question is not improper (Estate of Finkler, 3 Cal.2d 584, 594 [46 P.2d 149]). While it called *716 for the conclusion of the witness it was not prejudicial error in this case in view of the fact that the doctor did not testify as to the decedent's mental condition at the time when she made the deed, and in view of the rule of Moore v. Moore. The doctor's other testimony shows that whenever he saw the patient (with a few exceptions) she was irrational, which meant, of course, that she was extremely weak mentally. His concession that she might have been lucid at times would not militate against the other evidence in the case (sufficient to sustain the findings), which shows that this patient was extremely weak mentally from the time he first attended her until her death.
 [1b] In the briefs on both sides the evidence is discussed and authorities are cited on several phases of undue influence, but as we have seen (Richards v. Donner, supra), it is not necessary to consider such other phases of that subject under the rule invoked.
 [4] The appellant makes the point that under section 259 of the Probate Code a nonresident alien cannot inherit without first showing that reciprocal rights of inheritance exist between this country and the country of which such alien is an inhabitant, and, consequently, that the respondent is not in a position to attack this deed. The answer to that contention is, that while the will describes Annie Munnelly as "of Ballaina, County Mayo, Ireland" the record nowhere shows that she is an alien.
 The decree appealed from is affirmed.
 Nourse, P. J., and Dooling, J. pro tem., concurred.