[Civ. No. 22683.   Second Dist., Div. Two.   Jan. 28, 1958.]

HERMAN SETH PHILBROOK, an Incompetent Person, Respondent, v. ISABEL DUTTON HOWARD, Appellant.

Loyal D. Frazier, Alfred Lawrence and Walter C. Bowman for Appellant.

Loughman & Fay and John F. Fay for Respondent.

FOX, Acting P. J.—This is a suit for rescission of a conveyance of real property brought in plaintiff's behalf by his legally appointed guardian. The complaint alleges three causes of action as grounds for rescission: (1) that when plaintiff executed the conveyance he was of unsound mind to such an extent as to be incapable of transacting business; (2) that the consideration for the conveyance was grossly inadequate; and (3) that the conveyance was the result of defendant's exercise of undue influence over plaintiff. De-

fendant's answer consisted of a general denial and the affirmative defenses of laches and ratification.[1] The trial court found that at the time of the transaction in question plaintiff was of unsound mind within the meaning of Civil Code, section 39,[2] that the consideration given for the property was grossly inadequate, that there was no confidential relationship existing between plaintiff and defendant but that defendant did exert undue influence over plaintiff within the meaning of subdivision 2 of section 1575 of the Civil Code, consisting of "taking an unfair advantage of another's weakness of mind." The court found further that plaintiff was not guilty of laches and did not ratify the transaction. The court granted rescission of the conveyance, ordered defendant to reconvey the property to plaintiff, and ordered plaintiff to reimburse defendant for the money she paid toward the purchase price ($2,000) and for the improvements she made which increased the market value of the land ($1,750), less the sum of $1,195 for sand, rock and gravel royalties received by defendant during her occupancy and the sum of $1,275 which represents the reasonable value of defendant's use and occupation of the premises. Defendant has appealed from the judgment.

The evidence discloses that at the time of the transaction in question plaintiff was 86 years old. He had resided on his 640-acre ranch near Moorpark, California, for several years. He lived as a hermit in a small trailer on the ranch. In 1947 plaintiff had become acquainted with defendant and her husband; they owned a ranch about five miles from him.

About 1950 the Howards first discussed with plaintiff the possible purchase of his ranch. Defendant testified that plaintiff said he would sell his ranch for $20 per acre or a total of $12,800, payable at $75 per month with no interest on the balance. Defendant offered to pay this price but plaintiff declined to sell.

During the following years defendant sought on several occasions to purchase the land from plaintiff at the same price. But plaintiff always refused. In January, 1955, plaintiff was asleep in his trailer when a fire broke out. In escaping he suffered a blow on his head and his hair was

---

[1] Defendant's answer also contained two counterclaims which are not relevant to the questions involved upon this appeal.

[2] "A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before his incapacity has been judicially determined, is subject to rescission, as provided in the Chapter on Rescission of this Code."

singed. His mental condition deteriorated rapidly after the fire and he continuously complained of headaches and an indentation in his head. Shortly after the fire plaintiff went to defendant and insisted upon an immediate sale of his ranch to her for the same price and terms she had offered six years before, namely $12,800, to be paid at the rate of $75 per month with nothing down and no interest. There was no financial urgency for plaintiff to sell at this time; he had $16,000 in the bank, and income from oil leases and sand and rock royalties on his ranch amounted to about $2,500 per year. He had previously rejected an offer of $30,000 for his ranch because he thought it was worth more. Defendant testified that she told plaintiff his offer ''wasn't fair in any one's language'' and she suggested that she pay $2,000 down, $1,200 per year and 4 per cent on the balance of the $12,800 purchase price. Plaintiff agreed. At the time of this transaction (March 7, 1955) the property in question had a reasonable value of $33,000. Defendant has not attacked the trial court's finding that she knew the property was worth substantially more than the price set.

When the escrow papers were completed pursuant to defendant's instructions, the parties went to the escrow department of the bank. At the conference it appeared to the escrow officer that defendant and her son were doing all the talking and plaintiff was simply agreeing. The grant deed was recorded on March 28, 1955. Throughout the transaction plaintiff obtained no independent advice, legal or otherwise.

Following the close of the escrow plaintiff remained on the premises until November, 1955, when he was taken to the home of some friends in Santa Susana. Shortly thereafter he went berserk and was taken into custody by his long-time friend, Lieutenant Hollis of the Ventura County sheriff's office. Hollis subsequently filed a mentally ill petition regarding plaintiff and he was committed to Camarillo State Hospital in December, 1955. At the hospital his condition was diagnosed as chronic brain syndrome associated with senile brain disease, with psychotic reaction. An electroencephalogram was made showing diffused cortical abnormality, consistent with degenerative changes in the brain-tissue. The condition was progressive, permanent and incurable; in plaintiff's case it had progressed for years.

Plaintiff's daughter, Norma Carlson, was appointed his guardian in January, 1956. Shortly before this she made efforts to learn the details of the sale to defendant. Through

her attorneys Mrs. Carlson sent several letters to defendant seeking information. Defendant did not respond to any of these letters until her attorney wrote Mrs. Carlson on March 8, 1956. The letter demanded that Mrs. Carlson immediately remove plaintiff's goats and bees from the premises or maximum grazing fees would be charged.

Mrs. Carlson then commenced an investigation to determine the value of the land her father had sold. The preliminary appraiser's report, indicating a value of from $40 to $60 per acre, was received by Mrs. Carlson on May 11, 1956, and she immediately executed and served notice of rescission.

Defendant refused to rescind, and this suit was commenced on May 31, 1956.

Defendant's first two contentions are that there is insufficient evidence to support (1) the finding that plaintiff was of unsound mind at the time of the conveyance, and (2) the conclusion that plaintiff was suffering from "a great weakness of mind" of which defendant took advantage. Neither of these contentions has any merit. ■ "It has been established that in order to have relief under [Civ. Code, § 39] . . . it is not necessary that one be incompetent to enter into any kind of contract or to transact any business. Rather the test is whether or not the party was mentally competent to deal with the subject before him with a full understanding of his rights. Such a question is to be determined by the court or jury and if there is found in the evidence any rational ground supporting its determination its conclusion on this point will be upheld." (*Stratton* v. *Grant*, 139 Cal. App.2d 814, 817 [294 P.2d 500].) The law regarding one's taking advantage of another's weakness of mind is also clear. ■ "[T]he fact that the grantor is lacking in such mental vigor as to enable him to protect himself against imposition is a reason for the interposition of equity to protect him, although the mental weakness is not such as to justify him in being regarded as totally incapacitated." (*Stewart* v. *Marvin*, 139 Cal.App.2d 769, 775 [294 P.2d 114]; see also *Estate of Brast*, 69 Cal.App.2d 704, 713-714 [160 P.2d 193].) ■ In addition to the evidence recited above, there was a wealth of evidence indicating plaintiff's mental weakness at the time he executed the conveyance. On numerous occasions plaintiff failed to recognize friends and members of his family, made false accusations, suffered from hallucinations and delusions, became lost, and so forth. Plaintiff would often hold checks he received from his various sources of

income for more than a year without cashing them; some of the checks were never cashed but were found lying around the trailer or on plaintiff's person. On one occasion he purchased a new pick-up truck and then forgot about it; he denied the purchase when the truck was delivered. In addition several witnesses testified to the effect that plaintiff was of unsound mind and incompetent to transact business in March, 1955. Dr. Augur, staff psychiatrist at Camarillo State Hospital, expressed the opinion that plaintiff was incompetent in March, 1955; it was also his opinion that when a patient reaches the stage of delusions and fictitious complaints, he has lost the ability to judge for himself in business matters. It is unnecessary for us to mention the other evidence on these issues. It suffices to say that there is ample evidence to support all the court's findings concerning plaintiff's weakness of mind at the time of the sale.

Defendant's next contention is that plaintiff's action was barred by laches as a matter of law. This defense is directed at Mrs. Carlson rather than at plaintiff himself. Mrs. Carlson first learned of the transfer to defendant in May or June, 1955; since suit was not commenced until May, 1956, defendant concludes that the delay constitutes laches. Although the proposition seems highly doubtful, we shall assume, *arguendo,* that laches on the part of Mrs. Carlson would be imputed to plaintiff. ▉ ''The courts have frequently declared that there is no artificial rule as to the lapse of time which will justify the application of the doctrine of laches. Each case must be determined upon the basis of its facts, and in the absence of a palpable abuse of discretion the trial court's finding upon the issue will not be disturbed upon appeal.'' (*Williams* v. *Marshall,* 37 Cal.2d 445, 455 [235 P.2d 372].) ▉ It cannot be said that the trial court in the instant case abused its discretion in rejecting the defense of laches. About the time Mrs. Carlson was appointed guardian she directed her attorneys to contact defendant in an effort to obtain information concerning the details of the sale. Defendant's failure to answer the letters from Mrs. Carlson's attorneys contributed to the delay. When Mrs. Carlson finally obtained an appraiser's report, she immediately gave notice of rescission and commenced this action three weeks later. It is thus apparent that Mrs. Carlson acted promptly upon learning of the inadequacy of the consideration. Civil Code, section 1691, upon which defendant so heavily relies, only requires prompt rescission ''upon discovering the facts.''

Defendant's final contention is that the sale was ratified because notice of rescission was not given until May, 1956. In effect, this is merely a repetition of her argument concerning laches. Since Mrs. Carlson did not learn the actual value of the property until May, 1956, the trial court was justified in finding that the sale was not ratified. (See *Shaffer* v. *Security T. & S. Bank,* 4 Cal.App.2d 707, 717 [41 P.2d 948].)

The judgment is affirmed.

Ashburn, J., and Kincaid, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 26, 1958.

_____

*Assigned by Chairman of Judicial Council.